Elizabeth DOLE, etc., Plaintiff,

v.

LOCAL UNION 317, etc., Defendant.

Civ. A. No. 88-T-807-N.

United States District Court,
M.D. Alabama, N.D.

March 21, 1989.

---

James E. Wilson, U.S. Atty., David L. Allred, Asst. U.S. Atty., Montgomery, Ala., for plaintiff.

Thomas M. Goggans, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Elizabeth Dole, Secretary of Labor, brings this action pursuant to the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C.A. §§ 401 *et seq.* The Secretary charges defendant Local Union 317, National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers' International Union of North America, AFL–CIO, with violations of § 481(c) and (e) in the conduct of its election of officers in 1987. The Secretary asks this court to declare that the 1987 officers election as discussed below was null and void, and to order Local 317 to conduct a new election. Based upon the evidence presented at the trial of this cause on February 21, 1989, the court finds in favor of the Secretary.

## I. BACKGROUND

This dispute involves the election of seven officers of Local 317 in July 1987. The Secretary challenges the elections for the following positions: general president, vice-president, recording secretary, treasurer, executive board member, and administrative vice-presidents for Birmingham and for Montgomery.[1]

Local 317 chose to conduct a "mail ballot" election for these positions. Local 317 rented a post office box to use as a deposi-

---

1. The stipulated facts in the record do not refer to any vote totals for the position of "executive board member," but do report totals for the position of "Alabama State Representative." Local 317's notice of its nomination meeting refers to the office of "State Executive Board Member." The court assumes that all these offices are equivalent and that the Secretary's challenge extends to this election. The record also contains vote totals for the office of administrative vice-president for Huntsville, which position is not included in the Secretary's claim for relief.

tory for ballots submitted by its members. The election judges would count only ballots which had passed through the United States mails and would exclude hand-delivered ballots. In preparation for this election, Local 317 mailed to its members in late May 1987 a packet containing a notice of the upcoming meeting for nomination of candidates, a copy of "instructions," and a copy of two articles of the union's constitution. Although the "instructions" referred to "enclosed ballot(s)," Local 317 did not include any ballots in this late May mailing. The "instructions" directed members to "Seal the larger envelope addressed to the Local Union Judges of Election and deposit it in the U.S. Mail so that your ballot(s) will be received at the Post Office Box no later than 1:00 p.m. on July ___, 1987." The actual deadline for return of ballots, July 20, was not indicated in the instructions or elsewhere in this mailing.

Local 317 asserts that this deadline was announced at the nomination meeting, held in mid-June.[2] Also, in late June, the chair of the election judges committee sent a memorandum to the current administrative vice-presidents for the Alabama regions requesting that each administrative vice-president post notice of this deadline on post office bulletin boards. Shortly thereafter, Local 317 mailed 240 ballots to its members at their homes.[3] One hundred and ninety-six ballots arrived at the post office box by the deadline and, of these, 160 ballots were ruled valid and counted. The election judges voided 36 ballots.

Of these 36 ballots, the judges voided 23 because they bore neither a name nor a return address on the return envelope, and eight were voided because they contained a

return address but no name. The election judges also voided one ballot because the writing was not legible in the area set aside for the member's name on the outer envelope. They voided another ballot because it was hand-delivered and thus was not processed through the United States mail system. The court has no information as to why the other three ballots arriving at the post office by the deadline were voided.

Compilation of the officially counted ballots revealed the following election results:

**Local General President**

| | |
|---|---|
| C.C. VanDiver | 56 |
| Louis Washington | 10 |
| B.B. Browder | 48 [4] |
| Norman O. Warren | 20 |
| Harry Giddens | 25 |

**Vice–President**

| | |
|---|---|
| David Bailey | 53 |
| Eligah Lake, Jr. | 69 [5] |
| Erskine Nunn | 33 |

**Recording Secretary**

| | |
|---|---|
| Willie Brantley | 57 [6] |
| Julius Powell | 42 [7] |
| Ronnie Sanders | 55 |

**Treasurer**

| | |
|---|---|
| Eugene Blackwell | 11 |
| Able Williams | 15 |
| Jonathan Davis | 38 [8] |
| Eugene Hollins | 62 |
| Albert Dorsey | 32 |

**State Representative**

| | |
|---|---|
| M.G. McDermott | 17 |
| W.C. Flowers | 41 |
| C.L. Blue | 44 |
| R.D. Webster | 33 |
| Larry Copeland | 22 |

**Administrative Vice–President Birmingham**

| | |
|---|---|
| Harrison Beasley | 42 |

2. A member of the election judges committee testified at trial that the union changed the deadline for return of ballots around this time to July 20 from a previous date of July 13, 1987.

3. In the pretrial order in this case, the Secretary contended that Local 317 mailed 257 ballots to its members in late June. Based on the evidentiary record in this case, the court finds that Local 317 mailed a total of 240 ballots to its members for this election.

4. Investigators employed by the Secretary determined Browder's vote total to be 47.

5. Investigators employed by the Secretary determined Lake's vote total to be 68.

6. Investigators employed by the Secretary determined Brantley's vote total to be 56.

7. Investigators employed by the Secretary determined Powell's vote total to be 43.

8. Investigators employed by the Secretary determined Davis's vote total to be 37.

Administrative Vice–President Birmingham

| | |
|---|---|
| J.D. Jones | 8 |
| Julius Powell | 5 |
| Harry Giddens | 15 |

Administrative Vice–President Montgomery

| | |
|---|---|
| T.G. McCaskey | 18 |
| Joe Riley | 31 |
| Clarence Dotson | 3 |

Norman O. Warren, an unsuccessful candidate for president, filed a protest with the union regarding the election. After exhausting his available internal remedies, he complained to the Secretary, who filed this action after investigation.

## II. THE VIOLATIONS

■ To establish a violation of the LMRDA justifying the nullification of a union election, the Secretary must prove: (1) that the union's conduct constitutes a statutory violation; and (2) that the violation may have affected the outcome of the election. If the Secretary establishes the first element, then she may invoke a presumption that the violation may have affected the outcome of the election. The effect of this presumption shifts the burden to the defendant union to prove that the violation did not affect the election outcome. *Wirtz v. Hotel, Motel and Club Employees Union, Local 6*, 391 U.S. 492, 506–07, 88 S.Ct. 1743, 1751–52, 20 L.Ed.2d 763 (1968); *Donovan v. Local 10902, Communications Workers*, 650 F.2d 799, 802 (5th Cir. Unit B 1981) (per curiam). The court finds that Local 317 committed two statutory violations in the 1987 election, one under § 481(e) and another under § 481(c) of Title 29, United States Code Annotated.

### A.

■ The first violation under 29 U.S.C.A. § 481(e) derives from Local 317's failure to provide adequate notice of the critical election dates to its members. The LMRDA prescribes that the local must mail notice of the election no less than 15 days prior to the election itself to members at each member's last known home address. § 481(e). Although Local 317 did conduct a mailing to its members within this deadline, that mailing was wholly inadequate in terms of

providing effective notice of the specific day in July 1987 on which the election deadline fell. Regulations promulgated by the Secretary under the authority of the LMRDA set clear requirements on the contents of the union's election notice. "The notice must include the date, time and place of the election and of the offices to be filled, and it must be in such form as to be reasonably calculated to inform the members of the impending election." 29 C.F.R. § 452.99. The Secretary's regulation is couched in the conjunctive, not the disjunctive, compelling the conclusion that date, time and place are the minimal requirements for compliance with the regulation. This regulation, while not strictly binding on the court, is entitled to deference as the Secretary's interpretation of the statutory mandate of § 481(e). *See Brock v. Writers Guild of America, West, Inc.*, 762 F.2d 1349, 1357 (9th Cir.1985); *Cotter v. Helmer*, 692 F.Supp. 313, 317 n. 2 (S.D.N.Y. 1988). Using § 452.99 as a guide, the court finds that the late May mailing did not constitute "notice" within the terms of § 481(e).

■ Local 317 argues that it provided its members with effective notice through the announcement of the ballot return deadline at the nomination meeting and through its directive to administrative vice-presidents to post notice on bulletin boards. These arguments fail first against the explicit statutory language which requires notice by use of the mails. § 481(e); *see Brennan v. Local Union No. 639, International Brotherhood of Teamsters*, 494 F.2d 1092, 1097 (D.C.Cir.1974); *Brock v. American Postal Workers Union*, 123 L.R.R.M. (BNA) 3048 (D.N.J.1986) (available on WESTLAW, 1986 WL 15272). Beyond the clear statutory language, Local 317 has not shown that the alternative means of notice proved effective in this case. A member of the election judges committee testified for the union that he attended the nomination meeting at which the return deadline was announced, but did not remember how many members actually attended this meeting. The parties presented sharply conflicting evidence as to whether notices were ever posted on bulletin boards. The

court concludes from this evidence that a significant number of members never received notice of the election deadlines through these means. The union's own survey evidence, to the extent it bears on the issue, suggests that a sizable number of members never received notice of the election deadlines. Under these circumstances, Local 317 has not rebutted the Secretary's evidence showing of a violation of § 481(e).

**B.**

■ The court also finds that Local 317 violated 29 U.S.C.A. § 481(c), which compels it to provide "[a]dequate safeguards to insure a fair election." The Secretary argues, and the court agrees, that the union breached this obligation by disqualifying voters in the election for failure to comply with technical requirements, while at the same time failing to provide instructions on how to meet such requirements. *See* 29 C.F.R. § 452.110(b) ("failure to provide voters with adequate instructions for properly casting their ballots may violate the requirement of adequate safeguards to insure a fair election").

Local 317 conducted their "mail ballot" election as a secret election, in which voters placed their ballot in an envelope and placed this envelope within a larger envelope, which they then mailed to the designated post office box. The instructions included in the late May mailing do warn members to place their name on the larger envelope, and that ballots within outer envelopes not containing the voter's name would be ruled void by the judges of election. This instruction constituted an inadequate safeguard of the member's right to vote, not because of flaws in its contents, but because it was mailed a month prior to the mailing containing the ballot. By separating the instructions and the ballot by such a long span of time, the union ran the impermissible risk that its members would not retain the instructions pending receipt of the ballot. The union should have realized the substantial possibility that members would misplace, throw away, forget, or simply neglect, the instructions by the time they received the ballot. Local 317

could have remedied this statutory violation quite easily by enclosing copies of the instructions in the June ballot mailing.

The Secretary presented credible testimonial evidence at trial to the effect that the technical requirements for the ballots were largely unknown and were communicated more through employee "word-of-mouth" than through instruction by the union. Local 317's evidence did not significantly undercut this showing. The union presented survey evidence compiled by an expert for the union. While the court has reservations about the weight to attribute to this evidence, it demonstrates at best that a substantial number of members did not understand the word of mouth instructions for voting or did not receive instructions at all. The union cites *Hodgson v. Local Union No. 920, Industrial Allied Workers,* 327 F.Supp. 1284, 1288 (E.D.Tex.1971), for the proposition that where the "vast majority" of union members understood the instructions, no violation of § 481(c) has occurred. Without commenting on that holding, the court finds that Local 317 has not demonstrated the predicate for it in this case. In failing to include instructions with the ballots in a single mailing, or at least in mailings reasonably proximate in time, Local 317 violated § 481(c). *See McLaughlin v. Local Union 1000, Civil Service Employees Assoc.,* 110 Lab.Cas. (CCH) para. 10,752 (N.D.N.Y.1988) (1988 WL 28987).

**III. EFFECT OF VIOLATIONS**

Having found two violations of § 481, the court now considers whether the violations "may have affected" the outcome of the election. § 482(c). The court finds under the circumstances of this election that Local 317's statutory violations certainly may have affected the outcome of each elected position challenged by the Secretary.

As noted above, proof of a statutory violation creates a presumption that the outcome of the election was affected thereby. This presumption arises as a result of explicit legislative intent, as recognized by

the Supreme Court in *Hotel Employees, Local 6*, 391 U.S. at 505–07, 88 S.Ct. at 1751–52 (*citing* 105 Cong.Rec. 19765 (1959) (remarks of Sen. Goldwater)). The presumption of effect shifts the burden to the defendant union to prove affirmatively, by a preponderance of the evidence, that the violations did not have any effect on the outcome of the disputed elections. *Id.*, at 507, 88 S.Ct. at 1752.

### A.

■ It is apparent that the violation of § 481(c), the failure to provide adequate instructions, may have affected the outcome of each election challenged by the Secretary. The parties have stipulated to certain critical facts relating to this issue. Each position in this election was decided by plurality, rather than majority, vote, and no runoffs were held between top votegetters. Therefore, the difference between the top vote-getter and the vote total of his closest competitor embodied the margin of victory in the election. The parties have also agreed that at least 31 ballots were voided by the election judges for technical defects.[9] The largest margin of victory under the stipulated facts was 27 votes in the race for administrative vice-president for Birmingham.

Under these stipulated facts, the statutory presumption of effect created by § 482(c) implies that a substantial number of ballots were excluded by the election judges because of confusion generated by the union's failure to provide adequate instructions, and that a sufficient number of these excluded ballots would have gone to second-place candidates to alter the outcome of the election. One way for the union to rebut this presumption would be to challenge the inference that the statutory violation caused ballots to be excluded. Another way would be to show that, if all the ballots possibly affected by the violation were voted in favor of the second-place candidate, that candidate still would not have as many votes as the winner of the tainted election. To use the Second Circuit's example, if Local 317 came forward with evidence revealing that 20 percent of the votes in an election had been tampered with, but that all officers in the relevant elections had won by an 8–1 margin (signifying that the tainted 20 percent, if voted for second-place candidates, could not overcome the margin of victory in any race), then the union would rebut the statutory presumption, and relief under § 482(c) would be unavailable. *See Wirtz v. Local Unions 410, 410A, 410B & 410C, IUOE*, 366 F.2d 438, 443 (2d Cir.1966), *cited in Hotel Employees, Local 6*, 391 U.S. at 507, 88 S.Ct. at 1752.

It appears to the court that Local 317 has chosen to rebut the presumption in this case principally by attacking the causal relationship itself between the statutory violation and the exclusion of ballots. The union argues in essence that it cured its violation by providing sufficient instructions prior to the election and that this cure severed any possible causal relation between the former violation and defective ballots. The union contends therefore that all of its members were, in fact, fully aware of the balloting instructions and that those who failed to follow the instructions did so through their own carelessness and not on account of any failure on the part of the union. For the reasons stated above, however, the court is not persuaded by this argument. On the contrary, the evidence convinces the court that more than 27 ballots—the largest margin of victory under the stipulated facts—were excluded as a result of the § 481(c) violation. As previously shown, the evidence adduced at trial, from both the Secretary's testimonial witnesses and the union's survey data, reflects that a substantial number of members did not understand the instructions or did not receive the instructions at all. The court

---

**9.** If the court includes the ballot voided for illegibility in the calculation, on the theory that adequate instructions would have impressed upon this voter the importance of legibility so as to allow him an opportunity to correct his defect, the number excluded becomes 32. If the court includes the ballot voided because it was hand-delivered, rather than mailed, then the number becomes 33. Whether the court uses 31, 32, or 33 is insignificant, however. Each figure exceeds the largest relevant margin of victory.

concludes that this violation may have affected the outcome of the elections challenged by the Secretary.

## B.

■ A similar analysis depicts how the failure to provide adequate notice under § 481(e) may have affected the outcomes of the races. The statutory presumption of effect created by § 482(c) implies in this instance that a substantial number of members of Local 317 did not mail their ballots in at all for the election or mailed them in after the voting deadline had passed. The presumption further implies that a sufficient number of these untimely ballots would have been voted for the second-place candidate in each race to affect the outcome of that race. Again the burden lies with Local 317 to refute these implications.

The evidence at trial established that Local 317 mailed 240 ballots to its members. Since there is no evidence to support a different figure, the court finds 240 to be the total number of voters eligible to vote in all races relevant to this case except those of administrative vice-presidents for Montgomery and Birmingham. The undisputed evidence also showed that the election judges *received* (as opposed to *counted*) 196 ballots. This leaves 44 eligible voters who did not return a ballot.[10] Since this figure exceeds the margin of victory for each of the five generally elected positions challenged by the Secretary, under the presumption and the facts as established at trial, it appears that the § 481(e) violation may have affected these outcomes.

This result applies as well to the regional races for administrative vice-presidents for Montgomery and Birmingham, although with slightly different numbers. Under the facts stipulated to by the parties relating to the Montgomery position, 72 members were eligible to vote in the race, and the election judges actually counted 53 ballots in it. Assuming the worst case scenario for the union, as the § 482(c) statutory presumption requires in the absence of con-

trary evidence, the number of counted ballots equals the number of received ballots. This leaves at most 19 ballots which the court further presumes were not mailed because of Local 317's failure to provide adequate notice of the election deadlines. This number exceeds the margin of victory, 13, for that race.

Under the stipulated facts relevant to the Birmingham race, 133 members were eligible to vote in this particular contest and 70 ballots were actually counted in that race. Making the equivalent worst case scenario assumption that the number of counted ballots equals the number of received ballots, this leaves 63 ballots which were not mailed because of the union's failure to provide adequate notice of the deadline. This number exceeds the margin of victory, 27, for the Birmingham administrative vice-president position.

The union argues that, while its members may not have received notice of the election deadlines through the mail, they did receive such notice through alternative means. The union, in essence, again seeks to refute the presumption of a causal relationship between the violation and the ballots not voted by its members. However, as discussed in a previous section, the court has substantial evidence before it to the effect that a significant number of Local 317 members never received notice of election deadlines through these alternative means. Local 317's own evidence reflects this fact as well. The court concludes that the union has not overcome this presumption that its violation of § 481(e) may have affected the outcome of the election.

## C.

■ Local 317 also presented evidence suggesting two final attempts to rebut the statutory presumption of a possible effect on the outcome of the elections. First, the survey data introduced by the union included statistics reflecting a moderate level of satisfaction among members with the cur-

---

**10.** The court rejects the Secretary's figure of 61 unreturned ballots, since it is based on the position that Local 317 mailed 257 ballots. *See* note 3, *supra.*

rent officers of Local 317.[11] One could conceivably infer from these statistics that the membership actually preferred those candidates who won the 1987 election, and that therefore even if the violations had not occurred those same candidates would have won. The court rejects this inference. It is far from apparent to the court that voters' preferences in a given election necessarily correlate to any significant degree with voters' later satisfaction with a person's conduct in that office.

■ In a similar vein, Local 317's expert testified at trial that, absent any evidence to suggest skewing, he would not expect any substantial deviation between the distribution of votes actually cast in the election and the distribution of votes which would have been cast by members who did not actually vote or whose votes were voided by the election judges. That is, if 80% of the members actually voting voted for Candidate 1 and 20% voted for Candidate 2, Local 317's expert suggests that 80% of the nonvoting members would have voted for Candidate 1 and 20% for Candidate 2.

The court accords this testimony little weight for purposes of § 482(c) and concludes with certainty that it is insufficient to support Local 317's burden. Local 317 presented no evidence justifying the assumption that the distributions between the two groups were substantially identical in this particular case. If the court simply accepted this premise in all cases without more, it would in practical terms reverse the direction of the statutory presumption by shifting to the Secretary the burden of showing deviation between the two distributions. *Hotel Employees, Local 6* does not allow such a ready evasion of Congress's intent. While it may in any case be impossible for the union to present any evidence to support its assumption of substantially identical distributions, this fact does not remove the burden from the union's shoulders. *Donovan v. International Association of Machinists, Local Lodge*

*851*, 622 F.Supp. 394 at 398 (N.D.Ill.1985). Since Local 317 presents no other evidence rebutting the presumption, the court concludes that the two statutory violations found above may have affected the outcomes of each election challenged by the Secretary in this case for the purposes of § 482(c).

## IV. RELIEF

■ These conclusions control the question of relief. Section 482(c) states:

> If, upon a preponderance of the evidence after a trial upon the merits, the court finds—
>
> .    .    .    .    .
>
> (2) that the violation of section 481 of this title may have affected the outcome of an election,
>
> the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization. The Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization.

The Secretary has proved her case and is entitled to the relief mandated by the statute. *E.g., Donovan v. District Council 35, Painters,* 702 F.2d 25 (1st Cir.1983).

Local 317 argues that, despite proof of statutory violations which may have affected the outcome of the disputed elections, this court should not upset the elections on equitable grounds. Local 317 contends that Warren—who after losing the election for general president filed the complaint with the Secretary leading up to this litigation—acted improperly in failing to bring the statutory violations to the union's attention before the election deadline. This failure, according to Local 317, implicates Warren in the violations themselves, de-

---

**11.** The survey included the question, "In general, would you say that you are satisfied or dissatisfied with the leadership of your local union?" Forty-nine percent of respondents answered that they were satisfied, 38.5% answered that they were dissatisfied. Affirmative responses to questions regarding satisfaction with job performance in particular offices were slightly higher.

priving him of the right to protest the election results after the fact.

The court is of the opinion that equitable concerns favor the relief requested by the Secretary. The court has no evidence whatsoever to suggest that Warren was personally involved in the commission of the statutory violations described above. This immediately distinguishes this case from *Marshall v. Local 1010, United Steelworkers*, 664 F.2d 144 (7th Cir.1981), on which Local 317 primarily relies. In that case, the court faced a situation in which the election protesters were themselves responsible for the "intentional and blatant [statutory] violations which occurred." 644 F.2d at 152. The facts of this case show no such misconduct on the part of Warren.

Nor do the facts support Local 317's view that Warren's failure to bring the substance of the violations to the attention of the union constituted serious misconduct on his part. Warren testified at trial that some members of Local 317 approached him with their concerns regarding the uncertainty surrounding the details of the election and that he referred these members to the election judges. Warren therefore took steps to make the union aware of the notice and instructions problems. Moreover, Warren had no way of knowing that Local 317 would be unable to remedy to the satisfaction of the law these problems which had come to its attention. That Local 317 did not do so, an issue which was only determined after an investigation by the Secretary and an adversarial trial, can not be attributed to any fault of Warren.

The court finds that Warren was not implicated in the statutory violations committed in this case, nor in the inadequate cures of the defects constituting those violations. Moreover, despite Local 317's attempt at trial to so characterize his actions, the court finds that Warren did not form any sort of illicit "scheme" to hold his complaints regarding the violations until after the election in order to acquire a second chance at victory. In short, the court concludes that the facts of this case do not support Local 317's argument that a new election is not proper as a matter of equity. Rather, the court finds that Warren conducted himself appropriately under the circumstances and that the relief requested by the Secretary is proper.

An appropriate judgment will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiff Elizabeth Dole, Secretary of Labor, and against defendant Local Union 317, National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers' International Union of North America, AFL–CIO; and

(2) That it be and it is hereby DECLARED that the election completed on July 20, 1987, for the following offices is null and void, and the defendant is ENJOINED to conduct forthwith a new election for these offices under the supervision of the Secretary of Labor and, insofar as lawful and practicable, in conformity with defendant's constitution and by-laws: local general president, vice-president, recording secretary, treasurer, executive board member, administrative vice-president for Birmingham, and administrative vice-president for Montgomery; and

(3) That the Secretary of Labor is DIRECTED to certify promptly to the court the names of the persons elected pursuant to this judgment.

It is further ORDERED that costs of this action shall be taxed against defendant, for which execution may issue.