**Alexis HERMAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

**Peter Raska, Jonathan Smith, William Smith, Daniel Zachman, Jr., Burnie Freeman, J. Renee Bost, and Wade Aerial, Plaintiffs–Intervenors,**

v.

**NEW YORK METRO AREA POSTAL UNION, American Postal Workers Union, AFL—CIO, Defendant.**

No. 97 Civ. 4450(CBM).

United States District Court, S.D. New York.

Dec. 16, 1998.

---

United States Attorney for the Southern District of New York, New York City by Andrew W. Schilling, for plaintiff.

Lewis, Greenwald, Clifton & Nikolaidis, P.C., New York City by Louie Nikolaidis, for plaintiffs–intervenors.

O'Donnell, Schwartz, Glanstein & Rosen, New York City by Joel Glanstein and Howard Wein, for defendant.

### *OPINION GRANTING SUMMARY JUDGMENT*

MOTLEY, District Judge.

### *OPINION*

Plaintiff Alexis Herman, the United States Secretary of Labor, filed this lawsuit to void a portion of the March 3, 1997 election of union officers of defendant New York Metro Area Postal Union ("Metro"). The Secretary contends that Metro violated the union election rules of the Labor–Management Relations Disclosure Act, 29 U.S.C. § 401 *et seq.* ("LMRDA"), by unreasonably disqualifying all seven opposition candidates for failing to submit required information by an unnecessarily strict and undisclosed deadline. Metro counters that the deadline was adequately published and was necessary for an orderly election.

The seven excluded candidates intervened as additional plaintiffs and Secretary Herman then moved for summary judgment.

The plaintiffs motion is granted because any reasonable fact finder would conclude that the union failed to give reasonable notice of the deadline it cited as its reason for disqualifying the seven candidates. Because of the likelihood that this LMRDA violation affected the election outcome, the election is void as to the seven offices at issue. A new election for the seven positions must be conducted under Secretary Herman's supervision.

### I. FACTUAL BACKGROUND

Because the court must view the facts in the light most favorable to Metro, the non-movant, the following account relies on points that Metro, the non-movant, has stated, admitted, or declined to rebut.

#### A. The Parties

Metro is a roughly 14,000–member local labor union representing U.S. Postal Service employees in the New York Metropolitan Area. Metro is a subordinate of the American Postal Workers Union ("APWU"), a national labor organization. Metro and APWU each are a "labor organization" covered by LMRDA § 402(i). (Def.'s Admis. ¶¶ 3–6.) Two Metro officers are particularly relevant to this case: Josie McMillian, the President, and Wilma Alexander, the Executive Secretary (*id.* ¶¶ 17–18).

Plaintiff-intervenors are seven Metro members nominated on February 19, 1997 as candidates in a March 3, 1997 election of union officers: William Smith for President, Jonathan Smith for Executive Vice President, Burnie Freeman for Director of Organization, Renee Bost for Secretary–Treasurer, Daniel Zachman for Director of Industrial Relations, Wade Aerial for Executive Secretary, and Peter Raska for Director of Maintenance Craft. (Def.'s Admis. ¶¶ 35, 40, 44, 49, 54, 59, 64). When Metro disqualified the seven from candidacy, Mr. Raska filed a complaint with plaintiff Alexis Herman, the United States Secretary of Labor.

#### B. Nominations for 1997 Metro Elections

Article 12, Section 8 of the Metro Constitution (Schilling Decl. Ex. B) provides for union officer elections every three years. On

March 3, 1997, Metro held such an election for thirty-two union offices. A notice in the January 1997 Metro newsletter announced that candidate nominations would be one of two agenda items at Metro's February 19, 1997 meeting. The notice read as follows (Def.'s Mem. at 3):

**NOTICE**

REGULAR MEMBERSHIP MEETING

**WEDNESDAY**

FEBRUARY 19, 1997

AT 5:30 P.M.

NEW YORK METRO UNION HALL

(NINTH FLOOR)

**AGENDA**

SECOND READING AND VOTING ON PROPOSED CONSTITUTIONAL AMENDMENTS

NOMINATIONS OF OFFICERS AND TRUSTEES

MEMBERSHIP CARD AND POSTAL I.D. MUST BE SHOWN

In February 1997, Mr. Raska was Executive Director of Maintenance Craft. He was a member of the incumbents' slate, but one gradually leaving the fold. After six years as Executive Director of Maintenance Craft, Mr. Raska sought to become Director of Maintenance Craft. Ms. McMillian, the incumbent President, told Mr. Raska several days before the caucus that she opposed this move and would support the incumbent Director of Maintenance Craft, James McCluster. (Def.'s Mem. at 3–4.) Meanwhile, Ms. Alexander spoke with Charles Edmonds about whether he would replace Mr. Raska as the slate's candidate for Mr. Raska's current Executive Director position. Ms. Alexander eventually drafted an acceptance form for Mr. Edmonds. (Def.'s R. 56.1 Stmt. ¶ 13.) More broadly, Mr. Raska and the six other plaintiffs-intervenors "had been dissidents for six months or so." (Def.'s Counsel, Tr. at 19).

In spite of any ongoing disputes, Mr. Raska attended an incumbents' caucus on February 18, 1997, the day before the nominations meeting. At the caucus, the incumbents finalized their "slate" for the upcoming election. Wilma Alexander, Metro's Executive Secretary, handed out nomination acceptance forms to all likely candidates, including to Mr. Raska for renomination to his Executive Director position. The form asked for the nominee's name, address, social security number, and position sought. Mr. Raska returned the form to Ms. Alexander after she repeatedly asked him to complete it and return it to her. (Def.'s Mem. at 3–4.)

At the February 19, 1997 nominations meeting, Mr. Raska left the incumbents' slate and aligned with a slate of six other members challenging the incumbents' slate. During the meeting, there were nominations for the thirty-two members of the incumbents' slate as well as for the seven members of the opposition slate. Ms. McMillian presided over nominations for thirty-one offices while Ms. Alexander presided over nominations for President. (Def.'s Admis. ¶¶ 19–21.)

For each nomination, the presiding officer (Ms. McMillian at all times except Ms. Alexander for nominations for President) publicly asked whether the nominee accepted nomination. Ms. McMillian and Ms. Alexander believed that nominees were required to submit their social security numbers and addresses in writing during the meeting or risk disqualification. None of the seven opposition candidates submitted a social security number and address during the meeting. (Def.'s Mem. at 6–7; McMillian Depo. at 64; Alexander Depo. at 85.) Neither Ms. McMillian nor Ms. Alexander reminded nominees of this requirement nor distributed any forms soliciting this information. (Def.'s Admis. 31, 32, 69.)

Ms. McMillian only solicited the social security number of one nominee, William Smith, the opposition candidate for President, because there were two William Smiths in Metro. The relevant William Smith was absent, so his social security number was offered by Jonathan Smith, a candidate on the same slate who nominated him. Ms.

McMillian then told him to submit it in writing instead. (Def.'s Mem. at 5–6; Alexander Depo. at 53–54).

At the meeting, Ms. Alexander had Mr. Raska's form from the incumbents' caucus the day before. That form was for Mr. Raska's anticipated renomination as Executive Director of Maintenance Craft, rather than for his nomination that evening for Director of Maintenance Craft, but the form had his social security number and address. At the meeting, Ms. Alexander did not turn in Mr. Raska's form for the other position as a submission of his social security number and address (Def.'s Mem. at 6–7; Alexander Depo. at 84), but she did turn in forms for two absent candidates (Def.'s Mem. at 5; Alexander Depo. at 16).

### C. Post–Nominations Raska Submission

On February 20, 1997, the day after the nominations meeting, Mr. Raska went to Metro's office and asked Ms. Alexander for a copy of the Metro Election Rules (Def.'s Mem. at 7). Ms. Alexander told him that he could not make a photocopy of the Rules. Rather, he only could copy the rules by hand. (Def.'s Mem. at 7; Tr. at 23–36.) Metro interprets its Constitution as prohibiting distribution of the Election Rules to members; it only allows members to copy the Rules by hand in an office appointment with a Metro officer. (Pl.'s R. 56.1 Stmt. ¶ 36–38).

Mr. Raska read the Election Rules, including the following sections:

> Eligibility.... Nominee must submit his/her name in print with the correct spelling to the Election Committee no later than 5:00 p.m. Thursday, February 20, 1997....

> Nominations.... (A) Any member in good standing may nominate an eligible candidate for any position at the General Membership Meeting to be held beginning at 5:30 p.m. on Wednesday, February 19, 1997.... (B) Each nominee shall submit complete address and social security number.

(Schilling Decl. Ex. C.) The Metro constitution, which Metro gave to all members at the nominations meeting, has a similar provision in Article 12, Section 7(a):

> Any eligible member may be nominated by any member in good standing. The nominee must announce acceptance at the nomination meeting either in person, or by written statement signed by him or her, and submitted in his or her behalf; the nominees shall provide their social security numbers and mailing address.

After reading the election rules, Mr. Raska left and returned with a sealed envelope containing his name, address, and social security number. (Def.'s Mem. at 8; Raska Depo. at 50, 65–66.) He gave the envelope to Ms. Alexander before the close of business on February 20, 1997. (Def.'s Admis. ¶ 73.) Ms. Alexander told him that he was required to submit his social security number and address at the nominations meeting, not the day after, but she forwarded his envelope to the Election Committee. (Def.'s Mem. at 8).

### D. Disqualification of the Seven Opposition Candidates

On February 21, 1997, the day after Mr. Raska's submission, Ms. McMillian and five other members of the incumbents' slate challenged all seven nominations on the opposition slate. The challenge sought to disqualify the seven nominees for failing to submit their social security numbers and/or addresses during the nominations meeting the night of February 19, 1997. (Def.'s Admis. ¶ 74, 77.)

On February 27, 1997, the Election Committee met to determine candidate eligibility and reviewed Ms. McMillian's challenge. The Committee had three members, all appointed by Ms. McMillian. At the meeting, the Committee found the McMillian challenge "valid" and disqualified all seven members of the opposition slate because they "failed to meet the requirements of nomination." (Def.'s Admis. ¶ 75–83.) Specifically, the disqualification was solely because the nominees' failure to provide their social security numbers and addresses during the nominations meeting violated Art. 12, § 7(a) of the Metro constitution. (Pl.'s R. 56.1 Stmt. ¶ 7, 25–26; Schilling Decl. Ex. N, Santana Depo. at 9.)

As a result of the disqualifications, the slate of Metro incumbents went uncontested, as it usually does; in at least its last three elections in the past ten years, Metro has seen its officers go uncontested. (Schilling Decl. Ex. H, McMillian Depo. at 10–11). Under Art. 12, § 7(b) of the Metro Constitution, when a candidate is unopposed, the Secretary casts one vote for him or her, and the candidate is elected by acclamation. (Schilling Decl. Ex. B.) The thirty-two unopposed candidates of March 3, 1997 were elected by acclamation for three-year terms.

### E. After the Disqualifications: Challenges to Metro's 1997 Election

After Metro disqualified the seven nominees on February 28, 1997, Mr. Raska exhausted union remedies and then filed a complaint with the Secretary of Labor. (Def.'s Mem. at 8.) On March 15, 1997, the Secretary filed this lawsuit under LMRDA § 482(b), which authorizes the Secretary to file a civil lawsuit against a union when probable cause supports the charge that an election violated § 481. On April 28, 1998, Judge Kimba M. Wood granted the motion of the seven nominees to intervene as plaintiffs. On June 26, 1998, the Secretary moved for summary judgment under Fed.R.Civ.P. 56. On October 30, 1998, the case was reassigned to the undersigned judge. Oral argument on plaintiff's motion took place on December 9, 1998.

## II. CONCLUSIONS OF LAW

### A. Summary Judgment in an Action Under LMRDA § 482

The basic rule in deciding on a Fed. R.Civ.P. 56 summary judgment motion is that "[u]ncertainty as to the true state of any material fact defeats the motion." *Gibson v. American Broadcasting Companies*, 892 F.2d 1128, 1132 (2d Cir.1989). The non-movant's burden is to "set forth specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), not just a "scintilla of evidence ... [or] some metaphysical doubt as to the material facts," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (citations omitted). The court then must view the facts in the light most favorable to the non-movant. *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). The court neither weighs the evidence nor resolves material factual issues but only determines whether, after adequate discovery, any such issues remain unresolved because a reasonable fact finder could decide for either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Gibson*, 892 F.2d at 1132.

Although LMRDA language provides for relief "after a trial upon the merits," 29 U.S.C. § 482(c), "[t]he language is not to be read literally and summary judgment lies in a proper case." *Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Div.*, 538 F.2d 946, 949 n. 5 (2d Cir.1976) (affirming order granting Secretary summary judgment, voiding election, and ordering new election) (citing *Brennan v. Local Union No. 639*, 494 F.2d 1092, 1094–98 (D.C.Cir.1974)); *Brock v. Local 471, Hotel, Motel & Restaurant Employees & Bartenders Union*, 706 F.Supp. 175, 179 (N.D.N.Y.1989) (granting Secretary summary judgment and holding that "to extent the that defendant Local 471 claims that a trial is statutorily required, and that summary judgment cannot be had under any circumstances, it is in error"); *McLaughlin v. Am. Fed'n of Musicians*, 700 F.Supp. 726, 737 (S.D.N.Y.1988) (granting Secretary summary judgment).

Accordingly, in actions the Secretary of Labor brings under LMRDA § 482, summary judgment is appropriate when the movant meets the usual Fed.R.Civ.P. 56 standards. "If there are no material issues of fact in dispute and the violation of § 481 'may have affected' the election results then summary judgment would be proper," as in any civil case in which any reasonable fact finder would find in favor of the movant. *Brock*, 706 F.Supp. at 179.

### B. The Secretary's Required Showing

#### 1. Statutory Procedure

LMRDA § 482 provides the process for enforcement of a union member's charge that

the union violated LMRDA § 481. First, the member must exhaust internal union remedies before filing any complaint. 29 U.S.C. § 482(a)(1), (2). Second, the member may then file a complaint with the Secretary of Labor. *Id.* § 482(a). Third, the Secretary must investigate whether probable cause supports that complaint of an LMRDA violation. *Id.* § 482(b). Fourth, if the investigation shows probable cause that a violation occurred, then the Secretary must sue in federal court for an order annulling the challenged election and requiring a new election under the Secretary's supervision. *Id.* § 482(b). Fifth, if the court finds that a "violation of section 481 of this title may have affected the outcome of an election, the court shall declare the election ... void and direct the conduct of a new election under the supervision of the Secretary." *Id.* § 482(c),(c)(2).

■ Based on these requirements, the Secretary, in prosecuting an LMRDA § 482 action in court, must show (a) exhaustion by a complaining member in good standing, (b) a violation of LMRDA § 481, and (c) that the violation may have affected the outcome of the election. *See Reich v. Local 89, Laborers' Int'l Union,* 36 F.3d 1470, 1474 (9th Cir.1994). The court's inquiry narrows in this case because of several Metro concessions on points that, even without the concessions, would not be in genuine dispute.

2. Elements Not in Genuine Dispute

a. Membership & Exhaustion

Metro concedes that the seven plaintiff-intervenors were members in good standing (Def.'s Admis. ¶¶ 33, 38, 43, 48, 53, 58, 63) and that Mr. Raska exhausted his union remedies before filing a timely complaint with the Secretary (Pl.'s R. 56.1 Stmt. 20 ¶ 39). Even without Metro's concession, any reasonable fact finder would conclude these facts from the record.

■ Mr. Raska's exhaustion and complaint are sufficient to support a challenge to the disqualification of the other six plaintiffs-intervenors. LMRDA exhaustion is a practical requirement that molds to the contours of the circumstances. Exhaustion efforts are sufficient to allow a complaint to the Secretary if they gave the union notice of the what the complaint would challenge. "The purpose of the exhaustion requirement is to give a union an opportunity to remedy [§ 481] violations and thus avoid unnecessary governmental intrusion.... [A] heavy burden is imposed on the union to demonstrate that it did not have adequate notice of the protest, keeping in mind that 'members should not be held to procedural niceties while seeking redress within their union.'" *Donovan v. CSEA Local Union 1000,* 761 F.2d 870, 874 (2d Cir.1985) (quoting *Hodgson v. Local 6799, United Steelworkers,* 403 U.S. 333, 341 n. 6, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971)).

■ Here, any reasonable fact finder would conclude that Mr. Raska's exhaustion efforts were sufficient to let Metro know that if it did not redress the problem, Mr. Raska could seek annulment of the seven disqualifications. It was the same deadline that disqualified the seven nominees who were aligned on the same slate that would have been the sole opposition to the incumbents' slate. Of the seven members on his slate, Mr. Raska was the one who went to look up the Election Rules and had Ms. Alexander inform him that it was too late to submit the required information. Redundant complaints by all seven would have given Metro no additional information on which to base its response to the charge. If Mr. Raska's complaint were successful, it would have vindicated all seven candidates that the Union viewed as disqualified once the nominations meeting closed. Even where redundant efforts would be the technically proper path, their absence will not render exhaustion insufficient where the efforts made gave the union ample notice. *See Dole v. Tel. Traffic Union Local 1110,* No. 86 Civ. 4487(PNL), 1990 WL 42387, at *5 n. 6 (S.D.N.Y. Jan. 16, 1990) (rejecting union claim that complainants failed to exhaust because the union's complaint procedure required them to attend the union's hearing because "the Union had notice of the protests and possessed sufficient information and knowledge to determine the merits of the protest without the presence of Complainants ... Thus, Complainants' failure to appear at the hearing did

not prevent [the union] from investigating the protests or formulating a remedy."). More broadly, otherwise sufficient exhaustion efforts do not fail for technical deficiencies that do not affect the quality of the union's notice. *See, e.g., CSEA Local Union 1000,* 761 F.2d at 874 (collecting cases approving of otherwise sufficient exhaustion efforts that were made a few days late); *Tel. Traffic Union Local 1110,* 1990 WL 42387, at *4 (same).

### b. Effect on the Election Outcome

■ Counsel for Metro conceded at oral argument that Metro's decision to disqualify the seven nominees affected the election: "Yes, it did, no question it affected the outcome of the election." (Tr. at 31). Even if Metro had not conceded this point, any reasonable fact finder would conclude that if there was a violation, it "may have" affected the outcome, which is all LMRDA § 482(c)(2) requires. Proof of an LMRDA § 481 violation is prima facie proof of an effect on the outcome of the election. *See, e.g., Tel. Traffic Union Local 1110,* 1990 WL 42387, at *7. The union can rebut the presumption only with specific evidence, not just with the fact that "[i]t is impossible to predict the outcome had the Union's membership been allowed to participate fully." *Id.* Here the violation results in the exclusion of candidates, rather than just an uneven playing field among candidates or a partial voter disqualification. If the disqualifications here violated § 481, then their effect clearly was sufficient to compel a finding for the Secretary.

### C. The Secretary's Disputed Charge: Violation of LMRDA § 481(e)

With exhaustion and outcome effect not at issue, the only element of the secretary's showing remaining in dispute is whether a violation occurred. Specifically, what LMRDA provision, if any, did Metro's exclusion of the seven candidates violate? The Secretary's complaint is that in requiring nominees to meet a meeting's-end deadline for submitting social security numbers and addresses, on penalty of disqualification, Metro violated LMRDA § 481(e). That section provides that "a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to ... reasonable qualifications uniformly imposed)." 29 U.S.C. § 481(e).

■ Courts interpret the scope of "reasonable qualifications" narrowly so as to comport with the broader statutory scheme and purposes. "The wording and legislative history of the statute shows a preference for eligibility; the allowance of 'reasonable qualifications' was not to be given a broad reach." *Donovan v. Local Union No. 120, Laborers' Int'l Union,* 683 F.2d 1095, 1102 (7th Cir. 1982). *Accord Herman v. Local Lodge 197, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, & Helpers,* 976 F.Supp. 129, 133 (N.D.N.Y.1997); *Martin v. Local 101, Transp. Workers Union,* No. CV 91–1871(RJD), 1992 WL 394175, at *9 (E.D.N.Y. Dec. 9, 1992). "[W]hether the [challenged rule] is a 'reasonable qualification' within the meaning of § 401(e) must be measured in terms of its consistency with the Act's command to unions to conduct 'free and democratic' union elections." *Wirtz v. Hotel Motel and Club Employees,* 391 U.S. 492, 499, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968). Accordingly, "any method of selecting candidates which unduly interferes with members' free choice is unreasonable." *Donovan v. CSEA Local Union 1000,* 761 F.2d 870, 875 (2d Cir.1985).

The Secretary concedes that Metro may require nominees to submit their social security numbers and addresses; the challenge is only to Metro's interpretation that this requirement necessitates that the submission be during the nominating meeting. This specific complaint narrows the inquiry further: was Metro's insistence that the duration of the nominations meeting was the only proper time for nominees to submit their information a "reasonable qualification"?

### D. Reasonableness of Meeting's-End Submission Deadline as Nominee Requirement

The Secretary contends that the meeting's-end deadline serves no legitimate union purpose. Metro claims to need the information

to check whether nominees are members in good standing with the requisite number of years of membership. In examining nominees, however, the Election Committee never checked duration of membership, the key information for which social security numbers would have been necessary. (Pl.'s R. 56.1 Stmt. ¶¶ 21–24.) Rather, it uses a list that discloses only current membership, not length of membership, and is organized alphabetically, not by social security number. Even if a submission requirement is reasonable, the meeting's-end deadline is unnecessary because Metro checks its membership lists only days after, not immediately after, the nominations meeting.

Metro counters that although it may not check duration of membership with the submitted information, it does use that information for other legitimate purposes, such as verifying that nominees are properly identified when names are printed wrong, handwritten unclearly, or identical to another member's name. Moreover, Metro never has received and accepted late nominee submissions before, so there is no proof of inconsistent nor biased rule application.

The court finds that based on the current record, a rule that nominees must submit their social security numbers and addresses by the end of the nominations meeting might seem a "reasonable qualification" to a reasonable fact finder. If Metro may require nominees to submit information, which the Secretary concedes, then Metro certainly may require some deadline for those submissions. A meeting's-end deadline, though strict, might be permissible for two reasons. First, the information sought is easy to provide. One would hope that the nominees, all postal employees, would know their addresses, and their social security numbers were on the membership cards required for meeting attendance. Second, the short two-week timespan from nominations to election might require officials to rush election preparations such as eligibility determinations and ballot production. Accordingly, on the current record, a rule of meeting-time submission, without more, would not by itself compel a judgment for the plaintiffs.

**E. Sufficiency of Notice of the Meeting's–End Deadline**

 The fact that a meeting's-end deadline might be permissible does not end the inquiry here. The Secretary argues that Metro did not disclose this deadline until the day after it passed, too late for the seven nominees to meet it. This is a challenge not to the deadline itself, but to the application of the deadline, which amounts to a claim that Metro impermissibly applied a requirement that otherwise could be facially valid. *See, e.g., Reich v. Local 89, Laborers' Int'l Union,* 36 F.3d 1470, 1474, 1478 (9th Cir.1994) ("While a particular procedure may not on its face violate the requirements of the Act, its application in a given instance may make nominations so difficult as to deny members a reasonable opportunity to nominate.") (quoting 29 C.F.R. § 452.47(b)).

**1. The LMRDA Requirement of Notice**

 The specific challenge to Metro's application of the deadline is that Metro did not provide adequate notice of the deadline before enforcing it against nominees. A union cannot enforce as a rule, on penalty of disqualification, a requirement that it has not adequately disclosed. Compliance with an insufficiently disclosed requirement is not a "reasonable qualification" for candidacy that allows union members a "reasonable opportunity" to run for office, as LMRDA § 481(e) requires. Department of Labor Regulations promulgated under the LMRDA emphasize that a candidate requirement is only reasonable if there is adequate notice of the requirement:

An essential element of reasonableness is adequate advance notice to the membership of the precise terms of the requirement. A qualification which is not part of the constitution and bylaws or other duly enacted rules of the organization may not be the basis for denial of the right to run for office.... Qualifications must be specific and objective. They must contain specific standards of eligibility by which any member can determine in advance whether or not he is qualified to be a candidate. For example, a constitutional provision ... would not be a reasonable

qualification ... [if] it is so general as to preclude a candidate from ascertaining whether he is eligible and would permit determinations of eligibility based on subjective judgments.

29 C.F.R. § 452.53. Courts regularly cite this regulation as an important elaboration of LMRDA standards. *See, e.g., Donovan v. CSEA Local Union 1000*, 761 F.2d 870, 875 (2d Cir.1985); *Donovan v. Local Union No. 120, Laborers' Int'l Union*, 683 F.2d 1095, 1103–04 (7th Cir.1982); *Martin v. Local 101, Transp. Workers Union*, No. CV 91–1871(RJD), 1992 WL 394175, at *8 (E.D.N.Y. Dec. 9, 1992). Even setting § 452.53 aside, it is well-established that unions have a statutory duty under the LMRDA to provide adequate notice of rules that are enforceable on penalty of voter or candidate disqualification, and that neglect of this duty voids a union election. *See, e.g., Dole v. Graphic Communic. Int'l Union*, 722 F.Supp. 782 (D.D.C. 1989); *Dole v. Local Union 317*, 711 F.Supp. 577 (M.D.Ala.1989); *Donovan v. Int'l Ass'n of Machinists, Local Lodge 851*, 622 F.Supp. 394 (N.D.Ill.1985).

Contrary to defense counsel's view that "it is not the union's view to be the[ ] caretaker" of nominees attempting to comply with election procedures, the LMRDA does place a critical duty of care-taking on unions. A union must take affirmative steps assuring that "[a]dequate safeguards to insure a fair election shall be provided." 29 U.S.C. § 481(c). *See also, e.g., Dole v. Local Union 317*, 711 F.Supp. 577, 581 (M.D.Ala.1989) (holding that where failure to meet requirements would disqualify voters, the union cannot "fail[ ] to provide instructions on how to meet such requirements") (citing 29 C.F.R. § 452.110(b)).

Also countering Metro's argument that it had no duty to provide fuller notice of the deadline to challenger candidates is that "[b]urdens on non-incumbent candidates should be critically scrutinized 'on account of the advantage that incumbents or committee-selectees naturally enjoy relative to rank-and-file members.'" *See Reich v. Local 89, Laborers' Int'l Union*, 36 F.3d 1470, 1474, 1477 n. 3 (9th Cir.1994) (quoting *Donovan v. CSEA Local Union 1000*, 761 F.2d 870, 876

(2d Cir.1985)). "Scrutiny of such burdens is especially critical," *CSEA Local Union 1000*, 761 F.2d at 876, because one of the concerns that motivated the LMRDA was the need to even the playing field for challengers to entrenched incumbents. "Union officers are rarely unseated, and when such an upset does occur, it is generally one of the union hierarchy and not a rank-and-file member who takes the prize." *Id.*

In the present case, the court must determine whether a union gave adequate notice of a deadline it cited as the basis for excluding all challengers. Two principles guide the court's analysis. First, notice was adequate only if it reliably informed potential nominees of the deadline. Second, if notice was inadequate, then the union must look to less restrictive alternatives to disqualification of all nominees missing the unclear deadline. *See, e.g., Dole v. Graphic Communic. Int'l Union*, 722 F.Supp. 782 (D.D.C.1989) (holding that union's choice of disqualification was "the worst alternative," compared to re-balloting or clarification for the future, because "[t]he LMRDA requires ... that unions take all reasonable steps to ensure that its members are given a fair opportunity to vote")

### 2. The Inadequacy of Metro's Notice of the Deadline

In three ways, Metro failed to make an adequate disclosure that it would enforce a meeting's-end deadline for the submissions as a requirement for nominees.

#### a. No Publication of Deadline: Vague Constitution and Election Rules

The exact deadline for submission is not so intuitively obvious that Metro need not disclose it. Metro claims that its Constitution and Election Rules make clear that the deadline is the end of the nominations meeting. Art. 12, § 7(a) of the Constitution reads as follows:

Any eligible member may be nominated by any member in good standing. The nominee must announce acceptance at the nomination meeting either in person, or by written statement signed by him or her, and submitted in his or her behalf; the

nominees shall provide their social security numbers and mailing address.

The relevant passages in the Election Rules read as follows:

> Eligibility.... Nominee must submit his/her name in print with the correct spelling to the Election Committee no later than 5:00 p.m. Thursday, February 20, 1997....

> Nominations.... (A) Any member in good standing may nominate an eligible candidate for any position at the General Membership Meeting to be held beginning at 5:30 p.m. on Wednesday, February 19, 1997.... (B) Each nominee shall submit complete address and social security number.

There are only two clear written deadlines, and they are for things other than submission of social security numbers and addresses. Under the Constitution, nominees must accept nomination during the nominating meeting. Under the Election Rules, nominees need not submit their names to the Election Committee until 5:00 p.m. the next day. There is no deadline in either text for submission of social security numbers and addresses.

Metro claims that even though the Constitution's submission requirement lacks an explicit deadline, the Constitution clearly implies that the meeting's-end deadline for nomination acceptance, which is textually nearby, applies. Failure to specify a deadline does not clearly imply a strict application of a different deadline, however. An added problem for Metro's interpretation is that the Election Rules have a different, later deadline for nominees to submit their names. Metro's interpretation would yield an anomalous result: the Election Committee requires immediate submission of nominees' social security numbers and addresses, but it can wait another day for their names. This is not only an unpersuasive method of interpretation, but also a somewhat inconsistent one. Both the Constitution and the Election Rules require social security number and address submission without providing an explicit deadline. If readers are to fill in the blank deadline with a nearby deadline, they would find February 19 in the Constitution (dead-line for acceptance) but February 20 in the Election Rules (deadline for name submission).

Metro's overconfident use of questionable and inconsistent interpretation methods is reminiscent of Lewis Carroll's classic parody of overconfident textual interpretation:

> Alice brings her comparable puzzlement about the "Jabberwocky" poem to Humpty Dumpty. " 'You seem very clever at explaining words, Sir,' " she says, " 'Would you kindly tell me the meaning of the poem called 'Jabberwocky'?' " Humpty Dumpty, an egghead absolutely obsessed with meaning, duly obliges, with an intellectual confidence rare even among critics of poetry: " 'I can explain all the poems that ever were invented—and a good many that haven't been invented yet.' " He goes on to interpret "Jabberwocky" according to whimsical fiat on the one hand (" ' "Brillig " means four o'clock in the afternoon' ") and a theory ... as nonsensical as his definition.

Hugh Haughton, *Introduction* to *Lewis Carroll, Alice's Adventures in Wonderland and Through the Looking–Glass* x–xi (Hugh Haughton ed., Penguin Books 1998). A reasonably perceptive nominee searching for the submission deadline would not find a time of "the end of the nominations meeting" in the union's texts any more than Alice could find a time of "four o'clock in the afternoon" in the Jabberwocky text.

After a careful review of the Constitution, the Election Rules, and both parties' evidence and arguments as to their interpretations of those two texts, the court holds both of the following. First, any reasonable fact finder would conclude that, even in the light most favorable to Metro, the two texts simply do not support Metro's imposition of a meeting's-end deadline for submitting social security numbers and addresses. This finding yields the legal conclusion that the texts did not give adequate notice of the deadline.

Second, any reasonable fact finder would conclude that even if Metro's interpretation of the two texts were plausible, the record taken in the light most favorable to Metro yields, at best, different plausible interpreta-

tions of the deadline for submitting social security numbers and addresses. Defense counsel conceded as much at oral argument. After the court said, "It doesn't tell them when. Is that right?", defense counsel responded, "Your Honor, that clearly is one interpretation that you could find.... My interpretation is that it does." (Tr. at 17.) Even if defense counsel's response is not a concession, no reasonable fact finder could conclude that Metro's interpretation is the one true reading of the two texts. This finding also yields the legal conclusion that the texts did not give adequate notice of the deadline.

■ A corollary to either of the above two holdings is that reasonable readers of the text could find different deadlines, or no deadline at all, for submission of social security numbers and addresses. For texts to disclose requirements adequately to provide the level of notice the LMRDA requires, they must state the requirements in reasonably clear language, not in Rorschach language whose meaning lies in the mind of the beholder. Notice of a requirement is inadequate when the supposed notice is a text providing ambiguous or nonexistent support for that requirement. *See, e.g., Dole v. Graphic Communic. Int'l Union,* 722 F.Supp. 782, 785 (D.D.C.1989) (voiding election that disqualified bulk-mailed ballots because "[n]either the constitution nor the instructions on the ballots clearly prohibits the mailing of ballots in bulk"); *Donovan v. CSEA Local Union 1000,* 761 F.2d 870 (2d Cir.1985) (voiding election because nominating committee disqualified candidates on "vague and subjective criteria," *id.* 761 F.2d at 875, as to which "[n]either the constitution nor any other document provides guidelines for committee members to use," *id.* 761 F.2d at 872, contrary to LMRDA § 481(e) and 29 C.F.R. § 452.53); *Donovan v. Local Union No. 120, Laborers' Int'l Union,* 683 F.2d 1095, 1104 (7th Cir.1982) (voiding election that disqualified candidate under Constitutional "competency" requirement because "[t]he term 'competent' is general and ambiguous, and when made a qualification for office does not allow a member to take steps to ensure that he will be eligible"); *Martin v. Local 101, Transp. Workers Union,* No. CV

91–1871(RJD), 1992 WL 394175, at *8 (E.D.N.Y. Dec. 9, 1992) (voiding election that disqualified candidate who had been terminated from employment because "the Union can point to no provision in its constitution or bylaws which incorporates the alleged rule. Although the Local asserts that the practice operates to give effect to sections 1 and 9 of its constitution, neither section provides for automatic termination of membership.").

■ Even if the submission requirement implied a pre-election submission, that only narrows the range to about two weeks. Notice of a deadline must disclose the actual deadline, not just a wider timeframe that would qualify some but disqualify others. *See, e.g., Dole v. Local Union 317,* 711 F.Supp. 577, 579 (M.D.Ala.1989) (rejecting notice that only announced ballot return deadline of "July" when the actual deadline was July 20). More broadly, partial notice is inadequate, even if it points the way for a member to discover the requirement. *See, e.g., Donovan v. Int'l Ass'n of Machinists, Local Lodge 851,* 622 F.Supp. 394, 397 (N.D.Ill.1985) (voiding election where supposed notices of meeting in bylaws and constitution "do not provide the information that a member would need to attend" because they omit meeting location, even though meeting date is discernible).

b. Inadequate Disclosure of Deadline At and Before Nominations Meeting

Aside from their textual inadequacy, neither the Constitution nor the Election Rules were provided adequately to potential nominees. Metro also failed to disclose the deadline during or before the nominations meeting, as it should have because the deadline was not otherwise disclosed. This failure by Metro to disclose the deadline adequately during and before the meeting also violated the LMRDA standard of disclosure of election requirements.

Though the Constitution and Election Rules were in effect well before the meeting, Metro did not provide them to members adequately. The Constitution was provided to members only at the nominations meeting, and no officer suggested that members con-

sult it for nomination rules. Members seeking nomination thus had to consult the Constitution while conducting whatever other business they had at the meeting, whether as nominees or otherwise. Even if they had some opportunity to consult the Constitution, this is a sharp contrast to the assistance that Metro officers provided for members of the incumbents' slate. At the caucus the day before, the Metro Executive Secretary, Ms. Alexander, provided all members of the slate with forms requesting all necessary information and then collected the forms herself.

The Election Rules were even less available. Refusing to allow members to photocopy the Election Rules, Metro "instructed anybody who came up to make a handwritten copy. They were not given a copy" nor allowed to use Metro copy machines, defense counsel admitted. (Tr. at 23.) This restriction stemmed from "speculation ... that the rules would be defaced or altered and there would be a misrepresentation to the general membership," even though defense counsel was not aware of any such problems. (Tr. at 24.) It is unclear how hand copying rather than photocopying could limit misleading alterations of the rules, even if that was the Metro leadership's genuine reason for restricting access to Election Rules it eventually cited in disqualifying those it branded "dissidents."

 The court will not rule on Metro's intent in limiting its disclosure of the Constitution and the Election Rules, however. Summary judgment is ill-suited for determinations of intent, which is not a necessary issue here anyway because bad intent is not a necessary element of a LMRDA § 481 violation. "[A] violation may occur even if it was not prompted by improper motives, [and] it cannot be cured because those involved 'acted from the best of motives.'" *Reich v. Fed'n of Catholic Teachers, Inc.*, 853 F.Supp., 710 (S.D.N.Y.1994) (quoting *Usery v. Stove, Furnace & Allied Appliance Workers,* 547 F.2d 1043, 1045 (8th Cir.1977)).

Rather, the present question is whether, regardless of its motive for doing so, Metro inadequately provided the Constitution and Election Rules to members not part of the incumbents' slate. Failing to make an announcement of the deadline at the nominations meeting, Metro's only disclosure was through the two texts. While Metro's officers were content merely to make their provisions available to an inquiring member, they took great effort to help members of their incumbents' slate comply with the deadline, mainly through Ms. Alexander's efforts at the incumbents' caucus the day before the meeting.

 Ms. Alexander's efforts to assist incumbent-aligned nominees for Executive Director for Maintenance Craft are a telling example. While Mr. Raska was still a political ally, Ms. Alexander gave him a form covering the necessary information and repeatedly asked him to return it to her. When Mr. Raska no longer was an ally, Ms. Alexander drafted a similar form for Mr. Edmonds to submit as the incumbents' slate's nominee. Any reasonable fact finder would conclude that Metro officials provided highly uneven notice: personal assistance with requirements for incumbents' slate members but mere availability of muddy texts for the rank and file. Even if an intrepid member could have complied, Metro officers made that task appreciably more burdensome by withholding the assistance their political allies enjoyed. This violates the LMRDA § 481(e) requirement of "reasonable qualifications uniformly imposed" as exactly the sort of uneven playing field that courts warn unions not to create. "Burdens on non-incumbent candidates should be critically scrutinized 'on account of the advantage that incumbents or committee-selectees naturally enjoy relative to rank-and-file members.'" *See Reich v. Local 89, Laborers' Int'l Union,* 36 F.3d 1470, 1474, 1477 n. 3 (9th Cir.1994) (quoting *Donovan v. CSEA Local Union 1000,* 761 F.2d 870, 876 (2d Cir.1985)).

Uneven forms of assistance aside, Metro's limited notice to average members is similar to forms of notice that courts have rejected in the context of voter deadlines. In *Donovan v. Int'l Ass'n of Machinists, Local Lodge 851,* 622 F.Supp. 394 (N.D.Ill.1985), the court found similar, but more extensive, notice to be inadequate. The union had provided notice of the nominations meeting with postings

at the union hall and on 21 workplace bulletin boards as well as with bylaw and constitution provisions disclosing the meeting date. *Id.* 622 F.Supp. at 396. This was inadequate, however: the postings might not reach the many laid off workers and the LMRDA "does not permit a union to discharge its obligation to provide notice of its nominations meeting by setting forth all necessary notice information within the union's bylaws and constitution." *Id.*

Similarly, in *Dole v. Local Union 317*, 711 F.Supp. 577, 579 (M.D.Ala.1989), the court rejected the union's notice of a July 20 ballot deadline. Though the union gave textual notice of only a "July" deadline, it announced the specific July 20 date at the mid-June nominations meeting. *Id.* 711 F.Supp. at 579. This was inadequate, not only because LMRDA § 481(e) and 29 C.F.R. § 452.99 require unions to mail notice to individual members, *id.* 711 F.Supp. at 580, but also because the union "ha[d] not shown that the alternative means of notice proved effective in this case" where its officials "did not remember how many members actually attended" the June meeting announcing the deadline. *Id.*

The principle here is that the sort of notice the LMRDA requires is more than "inquiry notice" and more than "constructive notice" based on custom and practice. Such limited notice is inadequate where, as in the above two cases and the present case, it is not "reasonably calculated to inform all members," 29 C.F.R. § 452.56(a) (discussing requirement of notice of nominations meeting). While the two texts were available before the meeting to inquiring members, making information available in union texts and at the union office is insufficient provision of that information. It is the union's affirmative duty to provide its members the information necessary for enjoyment of their LMRDA § 481(e) right to nominate, vote, and run in union elections.

### 3. Overall Inadequacy of Notice

The effect of these failures is cumulative, making their entire failure greater than the sum of its parts. Because the two texts were unclear, Metro had a duty to provide them before the meeting for interpretation and inquiries. Because Metro failed to provide the two texts adequately, it had a duty to clarify the deadline by the time of the meeting. Because Metro failed to clarify at the meeting, it had a duty not to construe a textually ambiguous submissions deadline so as to disqualify otherwise eligible nominees. Based on Metro's affirmative and negative acts making the deadline insufficiently disclosed to nominees excluded for missing that deadline, a reasonable fact finder could conclude only that Metro violated LMRDA § 481(e) in holding that the seven plaintiff-intervenors were disqualified once the nominations meeting ended without submissions of their social security numbers and addresses.

## III. CONCLUSION

For the reasons discussed above, plaintiff's Fed.R.Civ.Proc. 56 motion for summary judgment is granted. Plaintiff is to submit to this court a proposed order: (a) voiding the March 3, 1997 Metro election as to the seven offices for which plaintiffs-intervenors sought nomination; and (b) ordering a new election, under the Secretary's supervision, for those seven offices. Defendant will have five days from receipt of the proposed order to submit to this court any objections to the proposed order.