**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, AFL–CIO, CLC, Defendant.**

### Civ. A. No. 88–3001(HHG).

United States District Court, District of Columbia.

Sept. 22, 1989.

John D. Bates, Jay B. Stephens and George P. Williams, Washington, D.C., for plaintiff.

Sandra L. Hughes and Martin R. Ganzglass, Washington, D.C., for defendant.

### MEMORANDUM

HAROLD H. GREENE, District Judge.

This is a suit brought by the Secretary of Labor to set aside the results of an election held by the defendant Graphic Communications International Union. Plaintiff has filed a motion for summary judgment which will be considered below. The Court has jurisdiction to decide this case pursuant to Section 402(b) of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 482(b).

### I

### *Background*

Defendant is an international union made up of approximately 147,000 members in approximately 550 Locals throughout the

United States and Canada. In February, 1988, the defendant union held its quadrennial elections for officers and general board members. These were the first elections conducted under a direct mail ballot procedure adopted by referendum of the union's members in May, 1987. Pursuant to that referendum, the following constitutional language was adopted in relevant part:

> The elections of International Officers shall be by direct mail ballot conducted by the International Secretary–Treasurer
>
> . . .
>
> The International Secretary–Treasurer shall cause to be printed, self-addressed stamped envelopes, to be mailed together with the ballot, by the member voting to a lock post office box. . . .

This procedure required the union to obtain the correct addresses of union members. In order to do so, the Secretary–Treasurer sent a letter to all Locals and District Councils on July 7, 1987, requesting updated membership lists, including members' last known addresses and their social security numbers. On October 21, 1987 and again on December 15, 1987, District Council No. 2[1] provided the union with lists of some 14,000 members with their updated addresses, but did not include any social security numbers. The union advised Council No. 2 that the second list was unusable because the union could not cross-reference the names from the second list with those on the first without social security numbers.

On February 11, 1988, the deadline for requesting duplicate ballots, Council No. 2 provided the names of 3,072 members who had requested duplicate ballots, but again provided no social security numbers. Because the union did not check any of the lists against previously submitted lists, many members of Council No. 2 never received ballots and never voted.

Voting took place in February. Ballots were mailed to the last known addresses of each active member of the International.

---

1. District Council No. 2 is a group of Locals, primarily on the West Coast, affiliated with the International Union. Plaintiff-intervenors Correll and Sapiro are its Secretary–Treasurer and President respectively. The other plaintiff-intervenors hold various positions or allegedly are members of Locals affiliated with District Council No. 2.

The instructions on the ballots stated, "[b]allot secrecy can be maintained only if you follow the instructions carefully and personally mark and mail your ballot." In addition, the instructions themselves directed members to place the ballot in the secret ballot envelope, seal the envelope, place the envelope in the preaddressed reply envelope, and "mail the return envelope to the Post Office box printed on the business reply envelope...." Official Ballot Instructions, attached to Plaintiffs' Reply Memorandum; DeVito Affidavit, para. 10, Delchamp affidavit, para 5–7.

Council No. 2, which had opposed the direct-mail voting procedures adopted by referendum, devised a plan the alleged purpose of which was to increase voter participation. Stewards were to collect voted ballots from the members. These ballots, enclosed in their addressed envelopes, were collected at the shops, placed in sealed boxes, and mailed to the post office box identified by the union. In order to increase participation, and presumably to encourage members to return their ballots to the stewards rather than to mail them themselves, Council No. 2 gave members who returned ballots to the stewards $3.00 in state lottery tickets or a check for that amount.

Prior to implementing the plan, Fred Correll, Secretary–Treasurer of Council No. 2, spoke to Robert Slinskey, Chairman of the Board of Electors, to see if it would be permissible to return the ballots in bulk. Slinskey told him that the bulk mailing plan would be acceptable as long as each member voted a secret ballot.

On or before February 17, 1988, Council No. 2 mailed twenty-six sealed boxes and one envelope containing voted ballots to the union. Four other boxes containing duplicate ballots were mailed subsequently. On March 1 and 2, 1988, the Board of Electors concluded that the ballots mailed in bulk were not voted in accordance with the provisions of the constitution and decided not to count any ballots returned in the boxes. This decision was not announced to the union's members. Thus a total of 5,593

ballots returned in boxes by Council No. 2 were not counted.

Several members of Council No. 2 filed complaints with the Secretary of Labor, challenging the refusal to count ballots mailed in bulk and the failure to send ballots to certain members of the council. After an investigation, the Secretary concluded that these complaints were valid, and she brought this suit seeking an order setting aside the results of the election.

## II

### Legal Standards

■ The Secretary contends that the union violated section 401(e) of the LMRDA by depriving certain members of the right to vote. Section 401(e) provides that "every member in good standing ... shall have the right to vote for ... the candidate or candidates of his choice...." 29 U.S.C. § 481(e). The LMRDA also requires a Court to declare the challenged election void and to require the union to conduct a new election if it finds that a violation of Title IV "may have affected the outcome of an election." 29 U.S.C. § 482(c)(2). A violation of section 401 establishes a prima facie case that the outcome of the election may have been affected. *Wirtz v. Hotel, Motel and Club Employees Union, Local 6,* 391 U.S. 492, 506–07, 88 S.Ct. 1743, 1752, 20 L.Ed.2d 763 (1968).

In deciding a motion for summary judgment, the Court must "take the non-movant's evidence as true and draw all legitimate inferences in his favor." *Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987) (citations omitted). In addition

[i]f the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper.

*Greenberg v. Food and Drug Administration,* 803 F.2d 1213, 1216 (D.C.Cir.1986).

## III

### Membership Lists

■ As to the question of whether the failure to cross-reference the various lists

submitted by Council No. 2 resulted in a deprivation of ballots and therefore the right to vote to several thousand members in good standing, there are substantial factual issues in dispute. According to the government, some 1,367 eligible members whose names were included on the Council's duplicate mailing list were never sent ballots. In addition, of the 3,072 requests for duplicate ballots, 676 were sent duplicate ballots, and 50 voted their original ballots. Of the remaining 2,346 requests, 1,166 were verified as being received from eligible members who did not receive ballots.

Defendant contends, however, that many of these names submitted were not eligible members in good standing. It points to the fact that even the government could not verify at least 1,155 of the names submitted. This suggests at least the possibility of fraud and the submission of false names, and failure to send ballots to these persons would therefore not be a violation of section 401. Furthermore, extra caution in accepting names submitted by Council Number 2 could well be reasonable if there were indications of fraud. At the very least, this raises factual questions that cannot properly be resolved in the context of a motion for summary judgment.

## IV

### Bulk Voting

The Court need not decide the question of the membership lists, however, in order to grant summary judgment in favor of the government. With respect to the union's failure to count ballots mailed in bulk, and viewing all of the facts in the light most favorable to the union, the Court finds that numerous members in good standing were denied the opportunity to cast their votes and that the election must therefore be set aside.

There is no dispute over the fact that the union refused to count 5,593 ballots that were returned in boxes from Council Number 2. Thus, over 5,000 union members who attempted to vote were not allowed to do so. The only issue is whether the union's actions in refusing to count the votes constituted an "unreasonable deprivation" of the opportunity to vote and thereby violated section 401(e). *Hodgson v. Local Union No. 582, United Assoc. of Plumbers,* 350 F.Supp. 16, 19 (C.D.Cal.1972). The union contends that no such unreasonable deprivation occurred because its refusal to count the ballots was warranted.

First. The union maintains that it was justified to act as it did because the instructions regarding individual voting were clear and all members should have been aware that bulk mailing was not permitted. In fact, the instructions are not clear. Neither the constitution nor the instructions on the ballots clearly prohibits the mailing of ballots in bulk, although they both speak of direct mailing. In addition, the instructions list four instances in which a ballot will be invalidated, bulk mailing not being one of those instances. The ambiguity is further corroborated by the fact that even the Chairman of the Board of Electors of the national union concluded that Council Number 2's mailing plan was acceptable.

Under these circumstances, it was not unreasonable for individual union members to follow the advice of their local leadership—advice that was ratified by the Chairman of the Board of Electors—and return their ballots in their envelopes for bulk mailing.

Second. The union next maintains that Council Number 2 so abused the election process that the Court should exercise its equitable powers and refuse to set aside the election. In this respect, the union argues that officials of Council Number 2 abused the process by paying members to vote, by encouraging bulk mailing although they knew this was improper, and by interfering with members' votes at the plant. According to the union, sufficient factual issues are raised by these allegations to preclude summary judgment.

However, even assuming that Council Number 2 engaged in misconduct in the course of the election, the Court would not be justified in upholding the union's decision not to count over 5,000 ballots. The

Court of Appeals for this Circuit has recognized that

> when faced with intentional misconduct by defeated incumbents, the District Court may, consistent with the letter and spirit of LMRDA, exercise its discretion and not require a Section 482(c) reelection.

*Donovan v. Teachers Local 6,* 747 F.2d 711, 716 (D.C.Cir.1984). Cases governed by this principle, however, are rare. *See Marshall v. Local 1010, United Steelworkers,* 664 F.2d 144, 151 (7th Cir.1981). This is not such a case. In *Marshall,* the incumbent leadership intentionally violated the LMRDA, lost the election, and then sought to rely on its own violations to invalidate the election. *Marshall,* 664 F.2d at 147. The Court invoked its equitable powers and refused to set aside the election and the Court of Appeals for the Seventh Circuit affirmed. By contrast, in the instant case, whatever violations Council Number 2 may have committed, it is not relying on these violations to justify setting aside the election. Rather, it points to a violation committed by the union itself—its refusal to count over 5,000 ballots.

■ A third and final argument made by the union is that in view of the misconduct and deliberate use of improper voting procedures, it had no alternative but to refuse to accept the tainted votes. The LMRDA requires, however, that unions take all reasonable steps to ensure that its members are given a fair opportunity to vote. *Marshall v. American Postal Workers Union,* 486 F.Supp. 79, 83 (D.D.C.1980). *See also Wirtz v. Local Union No. 1622, United Brotherhood of Carpenters and Joiners of America,* 285 F.Supp. 455, 464 (N.D.Cal. 1968).

The Court concludes that the union did not fulfill this responsibility towards its members. There were many less drastic measures that it could have taken in response to the bulk mailing plan. As the Secretary points out, the union was informed of the plan one week before the vote. At that point it could have notified Council Number 2 and its members that bulk mailing was not permissible, sent out new ballots and postponed the election. In the alternative, it could have accepted the ballots and issued regulations clarifying the voting procedures for future elections. It also could have accepted the ballots and initiated an investigation into the alleged violations of the LMRDA. What the union chose, however, was the worst alternative. Without notifying the members, the union simply refused to count the ballots mailed in boxes. This falls far short of the reasonable care in protecting members' right to vote required by the LMRDA. *Marshall,* 486 F.Supp. at 83.

■ In short, whatever violations of the LMRDA may have been committed by officials of Council Number 2, the union was not entitled to commit its own violation of the LMRDA by refusing to consider the votes of its members. Even if it did not act in bad faith in refusing to count the ballots that would not justify its actions, for bad faith is not a prerequisite to a finding of a violation of section 401. *Donovan v. Local 10902, Communications Workers of America,* 650 F.2d 799, 801 (5th Cir.1981). And while Council Number 2 cannot rely on its own violations to argue for invalidating the election, it can certainly rely on the misconduct of the union if that misconduct "may have affected the outcome" of the election within the meaning of Section 482(c)(2). *Donovan,* 747 F.2d at 717.

■ As stated above, a violation of Section 401 constitutes prima facie evidence that the outcome of the election was affected as required by 29 U.S.C. § 482. In this case, there is additional evidence. Some 5,593 votes were not counted. The margin of victory in the contested elections ranged from 234 to 4,444 votes. Thus, using the maximum theoretical possibility theory, it is clear that the election may have been affected by the exclusion of the 5,593 votes. *See Postal Workers,* 486 F.Supp. at 82. *See also* reference in *Dunlop v. Bachowski,* 421 U.S. 560, 580, 95 S.Ct. 1851, 1864, 44 L.Ed.2d 377 (1975).

## V

### Conclusion

For the reasons set forth above, the Court concludes that the union denied a

substantial number of its members the right to vote, that its actions may have affected the outcome of the election, and that the elections should be set aside. The Court will grant the Secretary's motion for summary judgment. Accordingly, it is ORDERED that judgment be and it is hereby entered in favor of the plaintiff.