**Elaine L. CHAO, Secretary of Labor, United States Department of Labor, Plaintiff,**

**Frank Viering, Ed Fox, Bobby Donovan, Scott Shuster, and Georgina Lee, First Intervenors,**

**Frank Keller, Herb Griffith, and Bill Spear, Second Intervenors,**

**v.**

**LOCAL 54, HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION, Defendant.**

**No. 00–3256(JEI).**

United States District Court, D. New Jersey.

Oct. 9, 2001.

---

Office of the Solicitor, U.S. Department of Labor by Jeffrey S. Rogoff, New York City, for Plaintiff.

Spear, Wilderman, Borish, Endy, Spear and Runckel by Samuel L. Spear, Philadelphia, PA, for First Intervenors.

Meranze and Katz by Clairborne S. Newlin, Philadelphia, PA, for Second Intervenors.

Cleary & Josem, LLP by Regina Hertzig, Philadelphia, PA, for Defendant.

## OPINION

IRENAS, District Judge:

Presently before the Court is Plaintiff's Motion for Summary Judgment. The plaintiff Secretary of Labor (the Secretary) instituted this action against Local No. 54 of the Hotel Employees and Restaurant Employees International Union (Local 54) seeking to set aside the results of a mail ballot election held on June 26, 1999 for all union offices based on several violations of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 et seq. The Secretary asserts that Local 54 breached its statutory duty to mail notice of the election to each union member at his last

known address at least fifteen days prior to the election. 29 U.S.C. § 481(e). The Secretary further alleges that Local 54 failed to make "reasonable efforts" to maintain a current list of its members' home addresses for purposes of mailing notice of election as required by Labor Department regulations. 29 C.F.R. § 452.100(d). In addition, the Secretary similarly claims that defendant Local 54 denied members in good standing the right to vote guaranteed by Section 401(e) by failing to take the reasonable steps necessary to insure that all members eligible to vote were sent election ballots. Finally, the Secretary alleges that the use of member lists created by union representatives in the course of their employment in conducting a phone bank for the incumbent slate of union officers violated Sections 401(c) and (g), codified at 29 U.S.C. § 481(c) and (g). The Secretary maintains that these violations of the LMRDA may have affected the outcome election and therefore seeks a court order that new elections for all union offices be held immediately under the Secretary's supervision. This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 482(c).

The Court concludes, based on the undisputed material evidentiary facts, that (1) the union's failure to make reasonable efforts to maintain current mailing lists and to correct known invalid addresses, as well as its decision not to mail notice of election to all of its members, constituted violations of LMRDA Section 401(e); (2) the union's failure to undertake reasonable efforts to update and cure known deficiencies in its member address lists prior to the distribution of election ballots unreasonably deprived members in good standing of their statutory right to vote guaranteed by Section 401(c); and (3) the union's improper use of member lists created by union representatives in the course of their employment in partisan political activities

without advising other candidates of either the use or availability of these lists violated the nondiscrimination provision of Section 401(c). The court further determines that these violations "may have affected" the outcome of the election and that the Secretary is therefore entitled to an order setting aside the challenged election and directing that a new election be scheduled to be conducted under the Secretary's supervision.

For the reasons set forth below, Plaintiff Secretary of Labor's motion for summary judgment is **GRANTED**.

## I.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II.

In order for a court to nullify the results of a union election based on violations of the Labor–Management Reporting and Disclosure Act, the Secretary of Labor must show: (1) that the union's conduct

constitutes a statutory violation, and (2) that the violation "may have affected the outcome" of the election. 28 U.S.C. § 482(c)(2). Upon a determination by the court that a violation of the LMRDA has been established, the Secretary enjoys the benefit of a presumption that the outcome of the challenged election may have been affected. In other words, proof of a violation establishes a prima facie case that the outcome of the election may have been affected and shifts the burden to the defendant to show that the established violation did not affect the election results. See *Wirtz v. Hotel Employees Union Local 6*, 391 U.S. 492, 506–507, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968).

### A.

■ Section 401(e) of the LMRDA, codified at 29 U.S.C. § 481(e), requires that "not less than fifteen days prior to the election notice thereof shall be mailed [by the union] to each member at his last known address." A Labor Department regulation implementing this provision permits a union to comply by publishing the required statutory notice in its newspaper and mailing a copy of the publication to each of its members within the proscribed time period. 29 C.F.R. § 452.100. The regulation requires that the union, as part of its statutory duty to mail notice of election to each of its members, make "reasonable efforts" to maintain current mailing lists for distribution of the publication. *Id.* A primary purpose of the election notice provision of the LMRDA and the accompanying regulations is to promote "maximum participation in union elections" and thereby insure the responsiveness of union leadership to rank and file members. *See Reich v. District Lodge 720*, 11 F.3d 1496, 1498 (9th Cir.1993).

Defendant Local 54 distributed notice of its June 1999 election to its membership through the union's quarterly newsletter. The union concedes that it did not send statutory notice of election to 1,975 of its existing members (Def.'s Stat. Mat. Facts p. 5). The union argues, however, that its failure to mail election notice to the last known address of every member of the union should be excused because, despite its "reasonable efforts" to maintain a current address list for all of its members, its records contained a significant number of addresses which previous mailings had demonstrated to be invalid.[1] The mailing of election notice to members for whom the union possessed only addresses it knew to be invalid, the union argues, would have been a practically futile and administratively expensive effort and, in any case, could not have affected the outcome of the election.

The union's argument, however, fails for two reasons. First, the election notice provision of the LMRDA imposes an absolute duty on unions to mail election notice to the last known address of *each* union member without regard to the reasonableness of the union's efforts to maintain an accurate and up-to-date list of its members addresses. Second, the uncontested evidence regarding the nature and extent of Local 54's efforts to update its mailing lists and correct known invalid addresses prior to mailing notice of the June election clearly demonstrates that the union failed, as a matter of law, to satisfy its statutory duty to "make reasonable efforts" to keep the mailing list for its publication current.

---

**1.** Copies of the union's quarterly newsletter containing the required statutory notice were not mailed to members whose addresses were determined to be invalid because the union had previously had mail sent to those addresses that was returned by the United States Postal Service as undeliverable and unaccompanied by a forwarding address. (Def.'s Stat. of Mat. Facts at 5).

The language of Section 401 supports a strict application of its notice provisions. In contrast to the qualified language of other provisions of the statute, the election notice provision of Section 481(e) strictly mandates that a labor organization send written notification of an election and the opportunity to nominate candidates to the last known address of each union member. Other provisions of Section 481(e) require that the union provide "[a] *reasonable* opportunity" for the nomination of candidates and guarantee the right of every union member in good standing to be a candidate subject only to *"reasonable* qualifications uniformly imposed" by the union (emphasis added). Section 401(c) similarly requires a labor organization to comply with "all *reasonable* requests of any candidate to distribute by mail or otherwise at the candidates expense campaign literature ..." 29 U.S.C. § 481(c) (emphasis added). Indeed, as the D.C. Court of Appeals has observed, an earlier version of the election notice provision directed that " 'notice of a union election must be given in a manner which is *reasonably calculated* to inform *substantially* all of the members eligible to vote of the time and manner of seeking nomination and of the place and date of the election.' " *Brennan* v. *Local Union 639*, 494 F.2d 1092, 1097 (D.C.Cir. 1974) (citing Cong. Rec. 15189 (Senate, April 23, 1959)) (emphasis added). However, this language was ultimately replaced by the current language which explicitly instructs that written notice be mailed to all members at their last known address. The use of a reasonableness standard and similar qualifying language in other provisions of Section 481, strongly indicates that had Congress intended to incorporate a degree of flexibility into the election notice provision it would have done so explicitly. *See International Organization of Masters, Mates, & Pilots v. Brown*, 498 U.S. 466, 476 n. 10, 111 S.Ct. 880, 112 L.Ed.2d 991 (1991) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see also, Brock v. American Postal Workers Union South Jersey Area Local 526*, 1986 WL 15272 (D.N.J.1986) (observing that "it appears likely that where the drafters wished to include a reasonableness standard, they did so explicitly. The fact that no such standard is expressly included in the provisions for mailing notices indicates that no such standard was intended").

The majority of courts to consider this issue have strictly and literally applied Section 401(e)'s election notice requirement, rejecting the argument that the reasonableness of a union's conduct can excuse its failure to mail notice of an election to each member's last known address. *See Brennan*, 494 F.2d at 1097; *Brock*, 1986 WL 15272 at *3–4, (D.N.J.1986); *Dole v. Local 492, Bakery, Confectionery, and Tobacco Workers International Union*, 1989 WL 126182, at *4 (E.D.Pa.1989); *Marshall v. Office of Professional Employees Union Local 2*, 505 F.Supp. 121, 123 (D.D.C. 1981).

Relying heavily on the 9th Circuit's opinion in *Reich v. District Lodge 720, International Association of Machinists and Aerospace Workers, AFL–CIO*, 11 F.3d 1496 (1993), the union nevertheless contends that, in light of the Department of Labor's own regulations, a "reasonableness" standard should be applied in determining whether a union has complied with the notice requirement of the LMRDA. In *District Lodge 720*, the 9th Circuit considered the construction and application of Section 481(e)'s notice requirement where a union has opted to provide statutory notice through its newspaper, as Department of Labor regulations permit. The

Court recognized that "Section 481(e) on its face appears to impose an absolute duty upon unions to mail an election notice to the last known home address of each member," but nevertheless concluded that "a union that has taken reasonable steps to keep its mailing list current does not violate Section 481(e) if it does not mail copies of its newspaper containing election notices to members whose home address it has been unable to obtain or to those who will not receive the mailing if it is sent to the address on file." *Id.* at 1503. The Court, reading the statutory notice provision together with Department of Labor regulations, appears to have concluded that the statute's mandate is not as inflexible as its plain language suggests.[2] Defendant Local 54 urges this Court to adopt a similar construction of the LMRDA's notice provision. However, as the preceding analysis makes clear, neither the text nor the legislative history of the election notice provision support limiting a union's statutory duty by demanding merely "reasonable" compliance with the requirement that notice be sent to every members' last known address. Moreover, the Secre-

tary's regulations do not have the affect that the 9th Circuit suggests. While the Department of Labor regulations implementing the statute do require a union that has chosen to publish notice of election in its newspaper to make "reasonable efforts" to maintain current mailing lists for the publication, this regulation does not alter Section 481(e)'s express mandate.

A union's duty to maintain current mailing lists is simply a logical prerequisite to its statutory obligation to mail election notices. Before sending notice of election to all union members' last known addresses, Department of Labor regulations require that a labor organization make "reasonable efforts" to update its publication's mailing list. Nevertheless, after taking such steps, Section 401(e) plainly requires that notice actually be mailed to each member's last known address. Therefore, to the extent that the 9th Circuit's opinion suggests that a union's statutory duty is limited to reasonable compliance with the election notice provision, this Court declines to follow that opinion.[3]

2. In support of its decision to insert a reasonableness standard into the text of Section 401(e)'s election notice provision, the 9th Circuit noted, as an initial matter, that the Supreme Court has admonished courts to avoid an unnecessarily literal reading of congressional labor legislation. The oft-cited language in *Wirtz* to which the opinion refers cautions courts that a "proper construction [of the LMRDA] will frequently require consideration of its wording against the background of its legislative history and in light of the general objectives Congress sought to achieve." 389 U.S. at 468, 88 S.Ct. 643. This cautionary note does not suggest, however, that courts should ignore well-settled principles of statutory construction in applying the provisions of the LMRDA. The ultimate aim of statutory construction is to accurately discern the meaning and effect intended by Congress. As a basic precept of statutory construction, where the plain meaning of a statute is un-

ambiguous and admits of no exceptions, the express language of the provision is generally presumed to accurately reflect Congress's intent. *See Ross v. Hotel Employees and Restaurant Employees Int'l Union*, 266 F.3d 236, 243 (3rd Cir.2001) ("In any case turning on statutory interpretation, our goal is to ascertain the intent of Congress. To accomplish this goal, we begin by looking at the statute's language. If the language is plain, we need look no further.") (internal citation omitted).

3. It should be noted that, even under the 9th Circuit's construction of the notice provision, a union that chooses to use its newspaper as a means of providing notice of election is statutorily obligated to "make a reasonable effort to maintain a current mailing list of home addresses for all of its members." *District Lodge 720*, 11 F.3d at 1504. As discussed in Part II–B of this Court's opinion; based on the undisputed material evidentiary facts in the

■ The uncontradicted evidence shows that out of the union's 15,093 existing members, the union publication containing the statutorily required notice of the June 1999 election was mailed to only 13,118 members.[4] (Def.'s Stat. of Mat. Facts ¶ 11). The remaining 1,975 members, for whom the union knew its mailing lists contained invalid addresses, were never sent statutory notice of the election or the opportunity to nominate candidates as mandated by § 481(e). Because the statute clearly and unambiguously requires that notice be sent to last known address of all union members, these undisputed figures conclusively establish a violation of the election notice provisions of the LMRDA.

## B.

■ To adopt a strict construction of the LMRDA's election notice provision is not, however, to suggest that a union fully satisfies it statutory obligations merely by mailing notice to the last known address of each member, including those that previous mailings have proven invalid. As part of its statutory duty to mail notice of election to each of its members, labor regulations require a union to "make reasonable efforts" keep its membership lists current.[5] In an action by the Secretary of Labor alleging a violation of Section 401(e)'s notice requirement, a union bears the burden of showing that it took the steps necessary to comply with its statutory duty to "make reasonable efforts" to maintain updated member address lists. *District Lodge 720,* 11 F.3d at 1502 (9th Cir.1993) ("A union must affirmatively show that it has made reasonable efforts to maintain an accurate mailing list.").

■ While questions of "reasonableness" involve a primarily factual inquiry, in a non-jury case, where the material evidentiary facts relating to the issue of "reasonableness" have been fully developed in the record and are undisputed, the Court may appropriately grant summary judgment if a bench trial would not enhance its ability to draw inferences and conclusions. *See Coats & Clark, Inc. v. Gay,* 755 F.2d 1506, 1509–10 (11th Cir.), cert. denied, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985); *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1123–24 (5th Cir.1978).[6] Local 54 has put forth a detailed description, uncontested by the Secretary, of its efforts to maintain current address lists and correct known invalid addresses both before and after the mailing of election notices and ballots. However, based on a thorough review of the undisputed evidence,

---

record, defendant failed, as a matter of law, to make a "reasonable effort" to keep current records of its members mailing addresses and to correct known invalid addresses prior to mailing notice of the June 1999 election. Therefore, regardless of the standard used to assess Local 54's compliance with the LMRDA's notice requirements, the union's conduct with regard to updating its member address lists and distributing notice of election constituted a clear violation of LMRDA Section 401(e).

4. While Section 481(e) guarantees the right to vote only to "members in good standing," the statute requires that notice of election be sent to all union members, regardless of their eligibility to vote.

5. The 9th Circuit Court of Appeals emphasized that, in meeting its statutory obligations, a union must not only "initially take reasonable steps to obtain correct home addresses for all its members," but must subsequently "endeavor to keep the addresses that it has up-to-date." *District Lodge 720,* 11 F.3d at 1501–1502.

6. In an enforcement action brought by the Secretary of Labor pursuant to Section 402 of the LMRDA, the court, not a jury, is the trier of fact. *See Wirtz v. National Maritime Union of America,* 399 F.2d 544, 548 (2d. Cir.1968).

the Court concludes, as a matter of law, that no reasonable trier of fact could find that the union's efforts prior to the mailing of election notice and ballots were "reasonable" within the meaning of the Department of Labor regulations.[7]

In support of its claim that "reasonable efforts" were made to obtain and maintain up-to-date address information for its members, Local 54 provides a complete inventory of its general policies and practices with regard to the updating of member addresses, as well as the specific steps undertaken to accomplish this task prior to the mailing of notice for the June election. This full accounting reveals that the union lacks adequate procedures to insure that its records are regularly and systematically updated. Under the union's usual methods, correct addresses are generally obtained only if, in the ordinary course of business, the union's members happen to come to the union hall to attend meetings, invoke the union's grievance procedures, pay dues directly to the Dues Office, or for other union business. Indeed, of the thirteen "steps" identified by the union, ten consist merely of general reminders and periodic opportunities presented to the union's membership to provide the union with current address information.[8] However, while periodically reminding members to supply current address information and providing them with opportunities to

7. Questions of "reasonableness" are essentially mixed questions of fact and law. Where the material evidentiary facts regarding the extent and nature of a union's conduct with regard to the updating of member addresses are uncontradicted, the issue of the reasonableness of a union's efforts is essentially a legal question and appropriate for summary judgment where no reasonable trier of fact could reach a contrary conclusion. Indeed, summary judgment on questions of reasonableness may even be appropriate in cases where a jury is the trier of fact if there can be only one conclusion based on the uncontroverted facts contained in the record. *See West v. State Farm Fire and Cas. Co.*, 868 F.2d 348, 350 (9th Cir.1989) ("reasonableness becomes a question of law appropriate for determination on summary judgment when only one conclusion about the conduct's reasonableness is possible").

8. In setting out the steps taken to meet its statutory obligation to update mailing lists prior to the mailing of election notice in the union's quarterly newsletter, Local 54 notes that (1) change of address forms are available to members at the dues office window in the union hall; (2) those members who attend quarterly membership meetings are reminded to make sure Union records contain their correct address; (3) at training sessions for shop stewards at casino properties, stewards are reminded to remind union members to supply the Union with up-to-date address information; (4) at "re-bids," where union members employed at casino properties and union business agents meet periodically along with union business agents to choose their shifts based on seniority, those members who attend are provided the opportunity to submit change-of-address forms and reminded to keep their addresses with the union up-to-date; (5) as a matter of practice, the union's business agents remind members for whom they are responsible that mailing addresses provided to the union should be kept up-to-date; (6) those union members who come to the union hall to file grievances are instructed to fill out a form which requests the members current address and advises members to keep their addresses up to date with the union; (7) those members whose grievance is submitted to arbitration are mailed a form letter indicating that they must advise the union if they move or change their address while their grievance is pending; (8) all new casino and hotel employees hired into union positions are requested to provide their address on authorization cards and reminded, "as a matter of course," to keep their addresses updated with the union; (9) in an effort to maintain current mailing lists for its quarterly newsletter, the union periodically includes announcements encouraging members to update their addresses in issues of that very same publication; (10) finally, the union notes that, where mail returned by the postal service as "undeliverable" is accompanied by a forwarding address, such address information is entered into the union's computer records.

do so is necessary to supplement any effort to maintain current mailing lists, such general reminders cannot substitute for a systematic procedure for obtaining up-to-date address information on a periodic basis. Labor Department regulations requiring a labor organization which has chosen to provide notice of election via its quarterly newsletter to make "reasonable efforts" to update its member address lists clearly contemplate a union taking affirmative steps beyond relying on its membership to heed general reminders of the importance of supplying such information, particularly when a union is aware that its mailing lists contain a significant number of invalid addresses.

Of the remaining actions taken by the union prior to the mailing of election notice, most are either unrelated to the task of obtaining correct address information from its members or primarily intended to accomplish other goals. For instance, the union notes that its Dues Office cross-checks the union's membership lists with the participant list of the Severance Fund "in order to determine whether there are participants in the Severance Fund who are not union members and for whom the union is not receiving dues and to compare addresses." (Def.'s Mem. Opp. Summ. J. at 26). While this process may allow the union to purge its lists of inactive members and those no longer eligible to participate in the severance fund, it does little to satisfy the union's statutory obligations with regard to maintaining current mailing lists. The union also notes that, as part of its continual effort to collect dues, a series of letters are sent to members delinquent in the payment of their dues. Where a dues collection letter is returned due to an invalid address, a business agent is given the task of obtaining an updated address directly from the union member.[9]

Finally, Local 54 maintains that requests for updated addresses are periodically made to its members' employers. On January 22, 1999, approximately two months before mailing notice of the June election, the union sent letters to all casino employers requesting that they provide updated addresses for all Local 54 members. (Def.'s Stat. of Mat. Facts ¶ 38). The union did not, however, send similar letters to the employers of its non-casino members (Pl.'s Stat. of Undisp. Mat. Facts ¶ 43; Def.'s Stat. of Mat. Facts ¶ 38). In any event, the union acknowledges that none of the casino employers responded to the letter and does not indicate that any effort was made to follow-up on these requests (Def. Stat. Mat. Facts ¶ 38).

As the significant number of known invalid addresses in the union's records demonstrates, the union's usual approach to keeping its address lists current had proven ineffective. At the time that notice of election was mailed, the union was aware that it did not have valid addresses for 1,975 of its members. Mail sent to these addresses had previously been returned by the postal service as undeliverable. Nevertheless, the union took no affirmative steps beyond its usual practices to update its mailing lists or correct member addresses it knew to be invalid prior to mailing notice of election and the initial distribution of ballots.

---

9. As will later be discussed, the union's notably more aggressive efforts to obtain correct address information from those members delinquent in the payment of their union dues, when contrasted with its passive approach to the maintenance of the mailing lists for its quarterly newsletter, reveal the lackadaisical attitude with which it approached its statutory duty to provide notice of election to all of its members. It is ironic that the union is more vigorous in obtaining current addresses for members who are delinquent in paying dues than for members whose dues are current.

Notably, Local 54's remarkably passive approach to updating its member lists contrasts starkly with the significantly more proactive methods employed by the union to collect delinquent dues. Indeed, the union frequently enlisted the help of its business agents and shop stewards in collecting delinquent dues directly from its membership.[10] Each month, two letters, one from the Dues Office and another from a union business agent, were sent to those members for whom outstanding dues were owed. If no response to these letters was received, the union's business agents and shop stewards were specifically assigned the task of contacting individual members directly and reminding them of the importance of paying their monthly union dues in a timely manner.[11]

Indeed, following the mailing of election notice and the initial distribution of ballots, the union enlisted the assistance of its business agents and shop stewards, as it regularly did in collecting dues, in a belated effort to obtain current addresses from those members for whom the union's records contained invalid addresses.[12] Business agents were sent lists of members for whom the union possessed no valid address and instructed to make an effort obtain current address information within a 24 hour period (Def.'s Stat. of Mat. Facts ¶ 18). While the extent and effectiveness of business agents' efforts varied widely, this effort, along with faxes and phone calls from members directly to the American Arbitration Association, the organization supervising the operation of the election, resulted in the mailing of ballots to an additional 811 members who had not been sent ballots in the initial distribution.[13] With relative ease, the union could have employed these very same methods to update its mailing lists and to obtain current information for members for whom it knew it had invalid addresses prior to the mailing of election notice.

The union's aggressive approach to dues collection and its notably more proactive

10. Business agents are the contractual representatives of Union members and represent them in upholding the language of the collective bargaining agreement. Shop stewards are the direct liason between the members and the union. (Pl.'s Stat. of Undisp. Mat. Facts ¶ 6).

11. Indeed, the union notes that in situations where these letters are returned by the postal service due to an invalid address, a union business agent is "given the task of obtaining an updated address for the Dues Office." (Def.'s Stat. of Mat. Facts ¶ 45).

12. This last minute effort to update member addresses and cure deficiencies in the union's records, occurring just 10 days before the June 26th election, cannot be considered relevant to the union's efforts to comply with its statutory duty to mail notice of election. Department of Labor regulations clearly contemplate that "reasonable efforts" to update member address lists will be undertaken before the mailing of the union publication containing the required statutory notice.

13. As previously noted, Section 481(e) specifically guarantees the right to vote only to those union members in good standing. As such, in May, following the mailing of notice, the union compiled a list containing the names and addresses of all members who were eligible to vote and for whom the union possessed valid addresses to be used in distributing election ballots. (Def.'s Stat. of Mat. Facts ¶ 15). Under the union's existing policies, members more than two months behind in their dues payments were considered members not in good standing and therefore ineligible to vote. Any members not in good standing were given until May 31, 1999 to pay their delinquent dues and preserve their eligibility. While union's membership fluctuated slightly between the mailing of notice in March and the initial distribution of election ballots, viewing the figures in the light most favorable to the union, at least 2,407 of the 14, 209 union members in good standing as of May 31st were not included in the initial distribution of ballots on June 9th. (Def.'s Stat. of Mat. Facts ¶¶ 30–31).

efforts to cure the deficiencies in its mailing lists following the initial distribution of election ballots demonstrate its failure to make reasonable efforts to update its records and correct known invalid addresses prior to the mailing of notice and the initial distribution of ballots.

## III.

■ The Secretary further alleges that Local 54 violated Section 401(e) by denying a significant number of eligible members the opportunity to vote. Section 401(e) provides that each member in good standing "shall have the right to vote for the candidate or candidates of his choice." 29 U.S.C. § 481(e). The provision further states that "each member in good standing shall be entitled to one vote." *Id.* District courts in other jurisdictions have construed this language to require, at a minimum, that each member eligible to vote be given a "reasonable opportunity" to exercise his or her franchise. *See Donovan v. Local 10902, Communications Workers of America, AFL–CIO,* 650 F.2d 799 (5th Cir. 1981); *Dole v. Graphic Communications International Union, AFL–CIO,* 722 F.Supp. 782 (D.D.C.1989); *Marshall v. American Postal Workers Union, AFL–CIO,* 486 F.Supp. 79 (D.D.C.1980); *Hodgson v. Local Union 582,* 350 F.Supp. 16 (C.D.Cal.1972).

The issue presented before the court is whether, in a mail ballot election, a union's failure to take reasonable steps to update its address lists prior to mailing election ballots and its resulting failure to send ballots to 1,596 members in good standing, "unreasonably deprived" those members of the opportunity to exercise their right to vote. While Section 481(e)'s broad guarantees do not contain specific instructions with regard to the conduct of labor organizations in a mail ballot election, the right of every union member in good standing to vote must require, at a minimum, that a union take reasonable steps to maintain current mailing addresses for its members and to distribute election ballots to all those entitled to vote. *See Dole v. Graphic Communications International Union,* 722 F.Supp. 782, 786 (noting that the "LMRDA requires ... that unions take all reasonable steps to ensure that its members are given a fair opportunity to vote.").

As the foregoing analysis makes clear, Local 54 did not make sufficient reasonable efforts to update its mailing lists and correct known invalid addresses prior to distributing election ballots. Not until June 16th, after the initial distribution of ballots and less than 10 days before the election, did the union undertake affirmative steps to update its member address lists and cure known deficiencies in its records. There is little doubt that a significant number of the union's members in good standing, many of whom were never sent either notice of the election or a ballot, were deprived of an opportunity to cast their vote and thereby disenfranchised as a result of the union's failure to take reasonable steps to update its list of mailing addresses. The uncontradicted evidence establishes that, as of May 31st, the final date on which members could pay any outstanding union dues and insure their eligibility to vote, Local 54 had 14,209 members in good standing and therefore entitled to vote in the June election. However, the union concedes that ballots were originally mailed to only 11,802 members. (Def.'s Stat. of Mat. Facts ¶ 15). Moreover, although an additional 811 supplemental ballots were subsequently mailed to members who had not been sent ballots in the original mailing, the union does not dispute that at least 1,596 members eligible to vote were never mailed election ballots. (Def.'s Stat. of Mat. Facts ¶¶ 15, 30–31). By failing to take reasonable steps to that insure eligible members re-

ceived ballots, the union disenfranchised a significant segment of its members in good standing and thereby violated Section 481(e) of the LMRDA.

## IV.

 Finally, the Secretary contends that Local 54 and its officers violated Section 401(c) of the LMRDA by using lists of members' names and phone numbers gathered during official union business in soliciting votes on behalf of the incumbent slate of candidates. The allegations center around the use by two participants in phone banks conducted on behalf of incumbent union officers of phone lists generated in the course of their employment with Local 54. The undisputed facts establish that Robert Middlesworth, an arbitration representative employed by the union and a supporter of the incumbent McDevitt slate of union officers, solicited votes for the McDevitt campaign using phone lists compiled in the course of performing his official union job responsibilities.[14] Donna DeCaprio, a Local 54 business agent, also participated in a phone bank on behalf of the McDevitt campaign using telephone logs created in the course of her employment with the union. (Def.'s Stat. of Mat. Facts ¶ 58).

Section 401(c) of the LMRDA clearly proscribes the discriminatory use of "lists of members" by incumbent candidates for partisan political activities. The provision imposes a duty on every labor organization and its officers "to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members." 29 U.S.C. § 481(c). Labor regulations implementing this provision require a union that permits any candidate to use such lists to "inform all candidates of the availability of the list for that purpose and accord the same privilege to all candidates who request it." 29 C.F.R. § 452.71(b).

Unfortunately, neither the text of LMRDA nor its legislative history provide any indication that Congress ever specifically considered the intended scope of the phrase "lists of members" in Section 401(c). *See Marshall v. Local 933, United Automobile Aerospace,* 1980 WL 2020, at *2 (S.D.Ind.1980) (noting the lack of evidence in the legislative history regarding the intended breadth of this phrase). In the absence of specific guidance, the scope of the phrase and its application to specific factual scenarios must be determined "against the background of [the statute's] legislative history and in light of the general objectives Congress sought to achieve." *Wirtz v. Local 153, Glass Bottle Blowers Ass'n.,* 389 U.S. 463, 468, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968).

The general policy underlying the LMRDA, as expressed by Congress in Section 2 of the LMRDA, 29 U.S.C. § 401, places particular emphasis on the "vital public interest" in insuring that "labor organizations ... and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations." *Id. at § 401(a).* Moreover, as the Supreme Court has recognized, a primary purpose of Title IV is to insure free and democratic union elections by offsetting "some of the inherent advantages that incumbents enjoy over rank and file members." *International Organization of Masters Mates & Pilots v. Brown,* 498 U.S. 466, 476, 111

---

**14.** Middlesworth recorded the names and phone numbers of union members who telephoned him or left a message on the answering machine in his office at Local 54 in a notebook. (Def.'s Stat. of Mat. Facts ¶ 56).

This phone log contained the names and phone numbers of more than 2,000 union members. (Pl.'s Stat. of Undisp. Mat. Facts ¶ 75).

S.Ct. 880, 112 L.Ed.2d 991 (1991). Consistent with these legislative goals, the nondiscrimination provisions of Section 401(c) are clearly aimed at insuring that unions are evenhanded with respect to the use of member lists by candidates for union office.[15]

Local 54, citing no authority, urges this court to apply a very narrow definition of "lists of members," one which limits the scope of that term to "official" membership lists. The union does not dispute that the phone lists used by Middlesworth and De-Caprio in soliciting votes for the incumbent officers were compiled in the course of their employment as union representatives or that competing candidates were never advised of either the use of such lists or their availability (Def.'s Br. Opp'n Mot Sum. J. at 35, 36; Def.'s Resp. to Interrog. 22). The union nevertheless argues that Middlesworth's phone list, which contains the names and phone numbers of both current union members and his personal friends and family, is merely an individual union employee's own personal telephone log and does not fall within the category of member lists whose discriminatory use Congress intended to proscribe.[16]

However, such a narrow definition is inconsistent with both the text of the statute and the general objectives the Congress sought to achieve in adopting the nondiscrimination provision. A separate provision of Section 481(c) guarantees every "bonafide candidate" the right to "inspect *a list* containing the names and last known addresses of all members of the labor organization" within 30 days prior to the election in which he is a candidate. 29 U.S.C. § 481(c) (emphasis added). This provision further instructs that this list "shall be maintained and kept in the principal office of such labor organization by a designated official thereof." *Id.* Contrary to the defendant's proposed reading of these two provisions, the "lists of members" whose discriminatory use in favor of one candidate to the exclusion of all others is proscribed by the first part of Section 401(c) extends beyond this more precisely defined "list" which every candidate is given the right to inspect upon request.[17] The reference to multiple "lists of members" necessarily includes more than *the* "official" union roster that a union is statutorily required to keep and maintain in its principal office.[18]

15. Indeed, these provisions of Section 401(c) regulating access to member lists are important to the LMRDA's overarching legislative purpose of ensuring the vitality of union democracy: "When the union bureaucracy has exclusive control of the union member lists ... that bureaucracy has continuous contact with the union membership and particularly the local union officers, the advantages of incumbency over any attempt of an insurgent to promote his candidacy ... are obvious." *Brown v. Lowen*, 857 F.2d 216 (4th Cir.1988), aff'd. sub nom. *Int'l Organization of Masters, Mates, & Pilots v. Brown*, 498 U.S. 466, 111 S.Ct. 880, 112 L.Ed.2d 991 (1991).

16. The union does not similarly claim that the telephone log created by business agent Donna DeCaprio contained the names and phone numbers of personal friends and family or was intended for such personal use. Indeed,

apart from arguing that DeCaprio, like Middlesworth, created her office phone log for her own individual use and did not share this list with any other phone bank participants, the union does not dispute that this log was exclusively a list of active union members. (Def.'s Stat. of Mat. Facts ¶ 57). In any case, although Middlesworth and DeCaprio's motive for producing these lists appears to be in dispute, it is the use of such lists in soliciting votes and the manner in which they were generated and not the original or alternative intended uses for them which is relevant here.

17. *See Marshall*, 1980 WL 2020 at *2 (similarly rejecting an interpretation that applies the same definition to both of these provisions).

18. *See Id.* at *2 ("While the proscription against the discriminatory use of lists of members would necessarily include a list contain-

Moreover, in light of the LMRDA's goal of offsetting the inherent advantages that incumbent union officials enjoy over rank and file members and insuring that incumbent union officers observe the highest standards of responsibility and ethical conduct, a broader definition that precludes the discriminatory use of member lists compiled by union employees in the course of their official union duties best serves the objectives Congress sought to achieve.[19] The fact that such lists also contain the phone numbers of an incumbent union official's family and personal friends does not remove them from the scope of the statute. A definition of "member lists" which attempts to distinguish between personal or "unofficial" phone lists and the member lists regulated by the statute based on their precise content is simply unworkable. On the other hand, determining the scope of the statute's application based on the manner in which the lists of members are generated provides a more easily observable standard of conduct for incumbent union officials, is less susceptible to manipulation, and avoids involving the court in the tedious and unconstructive task of scrutinizing the content of individual union employee's office phone lists. Applying this broader standard also avoids any appearance of impropriety in a manner consistent with the purposes of the LMRDA.

Despite the intermingling of personal phone numbers with those of the union membership, these lists, having been compiled by union employees by virtue of their administrative positions, are the type of member lists whose discriminatory use Section 481(c) was intended to proscribe. As such, the Court concludes that Defendant Local 54 violated section 401(c) of the LMRDA, 29 U.S.C. § 481(c), by discriminating in favor of the incumbent slate of candidates with respect to the use of "lists of members" created in the course of union employees' performance of official administrative responsibilities without advising other candidates of either the use of such lists or their availability.[20]

## V.

■ As stated above, a violation of Section 401 of the LMRDA constitutes prima

ing the names and addresses of every union member, including one kept and regarded by the union as the 'official' union membership list, the Court must conclude that the proscription would apply equally to ... lists compiled by union members by reason of their participation in and supervision of sanctioned union activities."); *see also, Donovan v. Local 3106, Communications Workers of America* (MD Fla 1983) (applying a similarly broader construction of 29 U.S.C. § 481(c) and holding that a set of gummed address labels used by the incumbent slate of candidates constituted a "list of members" within the meaning of the statute).

19. *See Local 933*, 1980 WL 2020 (S.D.Ind. 1980) (reaching a similar conclusion with respect to the use of "private" member lists generated by union members "either directly or indirectly by reason of their administrative positions over specialized union sanctioned activities or groups" in mailing campaign literature for the incumbent slate of candidates).

20. The Secretary further asserts that the use of official or unofficial phone lists, created by union employees in the course of performing their union jobs, to soliciting votes and promote the candidacy of the incumbent slate of union officials violates Section 401(g) of the LMRDA which prohibits the use of "union funds derived from dues and assessments to promote the candidacy of any person for union office." 29 U.S.C. § 481(g). Although the fact that the amount of funds spent is insignificant does not place an expenditure outside the statute's reach, the Secretary has not specifically identified any expenditure of union funds, whether direct or indirect, connected to the production or use of either the Middlesworth or DeCaprio phone list. In the absence of any specific evidence in the record that union funds were used to create or facilitate distribution of these lists, Section 401(g) appears to be inapplicable on these facts.

facie evidence that the outcome of the challenged election may have been affected. 29 U.S.C. § 482; *See Wirtz v. Local 153, Glass Bottle Blowers Association,* 389 U.S. 463, 474, 88 S.Ct. 643, 19 L.Ed.2d 705. The union, therefore, bears the burden of presenting proof sufficient to establish that the outcome of the election was not affected. In any event, the Secretary is required to prove only that there is a "reasonable probability" that the established violations "may have affected" the outcome, not that the election results were actually affected. *See Wirtz v. Local Unions 410, International Union of Operating Engineers,* 366 F.2d 438, 443 (2d Cir. 1966).

The uncontradicted evidence leaves little doubt that Local 54's violations of the LMRDA "may have affected" the results of the June 1999 election. In a mail ballot election in which the incumbent slate of officers was re-elected by a margin of victory of between 416 and 548 votes, 1,975 members were never sent statutory notice of the election and the opportunity to nominate candidates, and at least 1,596 of those members eligible to vote were never mailed ballots. If Local 54 had complied with its statutory duty to mail election notice to each union member's last known address after making "reasonable efforts" to keep its mailing lists current and correct known invalid addresses, the level of participation in the June. 1999 election would very likely have been substantially higher. With more members given an opportunity to cast their ballots, the outcome of the election necessarily "may have been affected."

 Local 54 argues that, despite these violations, the Court should decline

to grant the Secretary's request for a new election and instead order that the Secretary supervise the next regularly scheduled election in June 2002. Characterizing its violations of the LMRDA as merely "technical," and noting the time and expense involved in taking affirmative steps to obtain valid addresses for its members before a court-ordered re-election, Local 54 maintains that, even if the Court determines that violations of the LMRDA occurred and may have affected the election, the purposes of the LRMDA would better be served by preserving the status quo and directing that the Department of Labor supervise Local 54's next scheduled election in June 2002.

However, despite the defendant unions contention that the LMRDA does not require an immediate new election in this case, this Court's refusal to grant the Secretary the proscribed statutory remedy would be clearly inconsistent with the express statutory mandate. Under the enforcement scheme set out by Section 402 of the LMRDA, a court order declaring the challenged election void and directing that a new election be conducted under the Secretary's supervision is the exclusive and automatic statutory remedy for a violation of the LMRDA. In interpreting the remedial provisions of 29 U.S.C. § 482(c), the Supreme Court has concluded that Congress "unequivocally declared that once the Secretary establishes in court that a violation of § 401 may have affected the outcome of the challenged election, 'the court *shall* declare the election to be void and direct the conduct of a new election under the supervision of the Secretary.'" *Wirtz v. Local 153,* 389 U.S. at 473–474, 88 S.Ct. 643 (emphasis in original).[21] This

---

**21.** The majority of courts presented with this issue have similarly recognized the inflexibility of Section 402's mandate with respect to the statutory remedy for established violations

of LMRDA. *See Usery v. Dist. 22, United Mine Workers of America,* 543 F.2d 744 (10th Cir. 1976) (citing *Wirtz* and the "mandatory language" of Section 402 in reversing district

unambiguous wording admits of no exceptions.[22]

Even if the LMRDA does mandate that a new, supervised election be held, the union argues that, given that its next regularly scheduled election is less than 10 months away, this requirement would be satisfied by the Department of Labor's supervision of the union's upcoming elections in June 2002. However, the two cases defendant cites for support are inapposite. In *Donovan v. Local 299, International Brotherhood of Teamsters*, 515 F.Supp. 1274 (E.D.Mich.1981), the court did not require a new election because there was an insufficient showing that the established violations, which the court characterized as merely "technical," may have affected the election. In *Donovan v. Local 10902 Communications Workers*,

650 F.2d 799 (5th Cir.1981), the Court, noting the absence of fraud or bad faith, declined to order an immediate new election where new nominations for the union's next regularly scheduled election were set to take place less than two and a half months after its opinion was issued. The Court did not conclude that it was within its discretion to modify or disregard Section 402(c)'s express statutory remedy, but rather determined that the statute's requirement that a new election be held would be satisfied by the regular triennial nomination and election of officers under the Secretary's supervision. *Id.* at 802. To the contrary, this Court does not conclude that Local 54's next regularly scheduled election in June 2002, more than 8 months away, would similarly satisfy the express remedial provisions of the LMRDA.[23]

court's decision not to order new elections following a finding that the defendant had violated Section 401); *see also Marshall v. American Postal Workers Union, AFL–CIO*, 486 F.Supp. 79, 85 (D.D.C.1980); *Wirtz v. Local Union No. 1622*, 285 F.Supp. 455, 456 (N.D.Cal.1968) (holding that, in light of the established violation of Section 401 and the Supreme Court's decision in *Wirtz*, the court has no discretion as to whether or not to order new elections); *Brock v. Local 630, Int'l Brotherhood of Teamsters*, 662 F.Supp. 118 (C.D.Cal.1987) ("a new election under the supervision of the Secretary is the remedy Congress expressly provided for in Title IV").

22. While Courts of Appeal in several jurisdictions appear to have recognized certain circumstances under which a court may invoke its equitable powers and, in its discretion, refuse to require a re-election under Section 482(c), the circumstances justifying a departure from the express mandate of the LMRDA are very narrowly circumscribed. *See Donovan v. Teachers Local 6*, 747 F.2d 711, 716 (D.C.Cir.1984); *see also Marshall v. Local 1010, United Steelworkers*, 664 F.2d 144, 151 (7th Cir.1981) (affirming a district court's refusal to set aside the results of a union election based on its equitable powers). Both cases involved challenges to union elections

initiated by defeated incumbent union officials who had themselves intentionally violated the LMRDA and sought to rely on their own violations to invalidate the election. The D.C. Court of Appeals recognized that "when faced with intentional misconduct by defeated incumbents, the district court may, consistent with the letter and the spirit of the LMRDA, exercise its [equitable] discretion and not require a Section 482(c) re-election." *Local 6*, 747 F.2d at 716. This is not such a case. In the instant case, the Secretary has initiated an enforcement action to vindicate both the statutory rights of individual union members and vital public policy interests that transcend the interests of the union's membership. In any event, even where it within the Court's discretion to exercise its equitable authority to deny or modify the proscribed statutory remedy, no compelling equitable considerations exist here which warrant a refusal to grant the relief requested by the Secretary. As the forgoing analysis makes clear, Local 54's violations, while not alleged to have been motivated by fraud or bad faith, were far from merely "technical" or trivial and clearly may have affected the outcome of the June elections.

23. Indeed, as noted in the Secretary's brief, the majority of courts have concluded that Section 402's mandate for an immediate new

## VI.

The uncontradicted evidence having established several violations of the LMRDA and defendant having presented no evidence sufficient to overcome the presumption that the outcome of the election may have been affected by these violations, the Secretary is entitled to an order declaring the June 1999 election void and directing the immediate commencement of a new election under the Secretary's supervision.

For the reasons set forth above, Plaintiff's motion for summary judgement is GRANTED. The Court will enter an appropriate order.

election applies even though a union's next regularly scheduled election is less than a year away. *See, e.g., Usery v. District 22 United Mine Workers*, 543 F.2d 744, 751 (10th Cir.1976); *Reich v. Local 843 Bottle Beer Drivers*, 869 F.Supp. 1142, 1154 (D.N.J.1994) (concluding that the LMRDA mandates that the court order a new election even though the court-ordered re-election would be held eight months before the next regularly scheduled election); *Dole v. Federation of Postal Police Officers Inc.*, 744 F.Supp. 413, 420–421 (E.D.N.Y.1990) (ordering a new election where the union's next regularly scheduled election was less than nine months away); *Brock v. Metropolitan District Council of Carpenters*, 653 F.Supp. 289, 293 (E.D.Pa.1986) (ordering an immediate new election even though the next regularly scheduled election was less than eight months away).